Filed 12/1/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| CITY OF GLENDALE, | B246697 |
| Plaintiff, Cross-defendant and Appellant, | (Los Angeles County Super. Ct. No. EC051903) |
| v. | |
| MARCUS CABLE ASSOCIATES, LLC, | |
| Defendant, Cross-complainant and Appellant. | |

APPEAL from a judgment of the Superior Court of the County of Los Angeles, Donna Fields Goldstein, Judge. Affirmed.

Rutan & Tucker, William M. Marticorena, Jeffrey T. Melching, Michelle D. Molko for Plaintiff, Cross-defendant and Appellant.

Coblentz Patch Duffy & Bass, Richard R. Patch, Ann E. Johnston, Allison L. Ehlert for Defendant, Cross-complainant and Appellant.

# INTRODUCTION

Defendant, appellant, and cross-respondent Marcus Cable LLC, dba Charter Communications, Inc., (Charter) appeals from orders granting summary adjudication in favor of plaintiff, respondent, and cross-appellant City of Glendale (Glendale); and Glendale appeals from an order granting summary adjudication in favor of Charter and from certain portions of a judgment in favor of Charter entered after trial. The disputes arise out of a cable television services system operated by Charter within Glendale and the free public, educational, and government-affairs (PEG) requirements in connection with such services.

We hold that federal law precluded Charter from obtaining a declaration of a right of offset against future franchise payments to Glendale for past overpayments of PEG fees to Glendale; Glendale did not breach any obligation in connection with its refusal to approve Charter's request to realign channel numbers for PEG programming that was broadcast on Charter's cable television system in Glendale; Charter had no further obligation to provide free video programming and cable modem services to Glendale; the trial court did not err in concluding that Charter had not conveyed to Glendale a permanent right to possess or use the fiber capacity for government intranet communications—an institutional network or "I-Net"[1]—and Charter established that Glendale improperly and contrary to law used PEG fees. Thus, we affirm the judgment.

---

[1] The I-Net service Charter provided for Glendale's exclusive use was a so-called "dark fiber" network by which Glendale provided the equipment to send and receive data over the fiber.

# BACKGROUND

Glendale filed a complaint and request for a temporary restraining order to prevent Charter from realigning Glendale's PEG channel numbers. Charter answered and filed a cross-complaint. In the operative third amended cross-complaint, Charter sought declarations that it had no obligation to provide Glendale with free video programming services and free cable modem services or with free I-Net services; recovery of possession and control of the I-Net and damages for wrongful possession and detention of the I-Net; a declaration that Charter had the right to realign Glendale's PEG channels; a declaration that Glendale was unlawfully using PEG fees; and a declaration that Charter had a right to offset past PEG fee overpayments against future franchise fee payments.

## A.     Summary Adjudication Issues

Glendale filed a motion for summary judgment or summary adjudication on its complaint, and the parties filed cross-motions for summary adjudication on Charter's operative cross-complaint. Following briefing and a hearing, the trial court issued a minute order adopting its written tentative ruling on the parties' respective motions as the final ruling of the court, as amended by the text of the minute order. The facts relevant to the trial court's summary adjudication rulings are set forth below. [2]

---

[2]     The facts pertaining to the summary adjudication issues are taken from the parties' respective separate statements of undisputed facts in support of their motions for summary judgment and summary adjudication. Because Glendale does not, in effect, contend that the factual findings made by the trial court following trial were not supported by substantial evidence, the facts pertaining to the issues determined at trial are taken from the court's findings of fact in its statement of decision. There are no significant disputes over the facts.

### 1. *Declaration of Right to Offset*

In December 2007, Charter was granted a state franchise that became effective in January 2008. Glendale established a franchise fee for Charter of five percent of Charter's annual gross revenues and a PEG fee of two percent of Charter's annual gross revenues, for a total annual fee obligation of seven percent of Charter's annual gross revenues. Charter collected the franchise and PEG fees from its subscribers and included those fees as separate line items on its subscribers' bills.

Charter sought a declaration in its fourth cause of action that Glendale improperly used the fees it collected for PEG operating costs resulting in an overpayment and a declaration in its fifth cause of action that Charter was entitled to deduct its PEG fee overpayments from future franchise fee payments. The trial court denied Charter's motion for summary adjudication as to whether Glendale improperly used the PEG fees, determining that there were triable issues of fact. The trial court also ruled on the cross-motions for summary adjudication that as a result of federal law, Charter was not entitled to a declaration that it could offset past overpayments of PEG fees against future franchise payments to Glendale.

### 2. *Reassignment of PEG Channels*

In 2009, Charter notified Glendale of a planned alteration of the location of Glendale's PEG channels as follows: (a) primary government access channel 6 moving to channel 3; (b) educational channel 15 moving to channel 95; (c) secondary government access channel 16 moving to channel 97; and (d) additional government access channel 21 moving to channel 32. Glendale refused to agree to the proposed channel realignment.

Charter claimed in its third cause of action that Glendale had breached an implied covenant of reasonableness by refusing to approve the channel realignment. The trial court granted Glendale's motion for summary adjudication, ruling that state law gave Glendale "absolute discretion" in determining whether or not to agree to an operator's request for a reassignment of PEG channels.

4

### 3.    *Free Video Programming and Free Cable Modem Services*

In January 1995, the predecessor of Charter entered into a local franchise agreement with Glendale (Glendale franchise) under which Charter's predecessor was granted authority to construct and operate a cable television system within Glendale. In October 1995, Glendale approved the transfer of the Glendale franchise to Charter. The Glendale franchise was for a 10-year term that expired in 2005.

Paragraph 12 of the Glendale franchise required Charter to provide Glendale with free cable services to public buildings, including cable drops for residential cable to specified buildings and facilities and upstream capacity from the specified buildings and facilities "to allow live broadcasting and rebroadcasting from said sites and facilities." Paragraph 14(c) of the Glendale franchise also required Charter to provide Glendale with an I-Net that would connect certain specified public buildings to "the activated return path of the cable television system" so as to "allow simultaneous insertion of five (5) audio/video/data programming sources into the return path from each designated location, the transmission of said programming to [any of the specified] building facilit[ies] . . . , the transmission of said programming to the headend and the simultaneous retransmission of said programming over the Residential Network upon completion of construction."

In or about 1999, a dispute arose between Charter and Glendale concerning a change in the corporate control of Charter's parent entity and certain franchise compliance issues. In September 1999, Charter and Glendale entered into a settlement and transfer agreement (settlement agreement) that resolved the corporate control and franchise compliance disputes and authorized Charter to continue to provide cable services in Glendale following the change in corporate control.

Paragraph 10 of the settlement agreement stated that Charter must provide or cause to be provided "free High-Speed Internet Access Service installation, modem and monthly service . . . on a stand-alone or network basis . . . to [specified public] buildings . . . ." Paragraph 12 of the settlement agreement provided that Charter was required, inter alia, to "complete and activate Government and Institutional [video]

5

drops" at specified public buildings, and to "complete and activate upstream and downstream institutional network . . . connections by way of fiber optic cable" to certain public buildings. Charter provided the upstream and downstream network functions required under paragraph 12 of the settlement agreement by delivering capacity on fiber optic strands that are contained in the fiber bundle that Charter used to provide residential services. Paragraph 11 of the settlement agreement provided, in part, "[Charter's] completion of the cable connections at the [specified] public, governmental and school locations . . . shall be deemed compliance . . . with the Franchise requirements to connect public, governmental and school buildings as required by Section 12 and Section 14(c) of the Franchise." Paragraph 6 of the settlement agreement provided that if Charter violated the settlement agreement, it "shall be deemed to be a violation" of the Glendale franchise, and Glendale would be authorized to invoke the liquidated damages provision of the franchise agreement for any such violation.

Charter and Glendale had discussions about the terms and conditions under which the Glendale franchise would be renewed at the end of its term, but no agreement was reached by the parties for the renewal of the Glendale franchise. Charter applied for and was granted a state franchise pursuant to the 2006 Digital Infrastructure and Video Competition Act (the State Cable Act)[3] on December 13, 2007, effective January 2, 2008. Charter's service area under the state franchise included Glendale. As of January 2, 2008, the Glendale franchise was replaced by the state franchise. The stated term of the Glendale franchise had expired at the time the state franchise was issued.

In connection with the present dispute, Glendale and Charter disagreed as to whether (i) Charter was obligated to provide Glendale with free use of the I-Net in perpetuity; (ii) Glendale possessed an ownership interest in the I-Net or should return possession and control of the I-Net to Charter; (iii) Glendale was obligated to compensate Charter for past use of the I-Net; and (iv) Charter was obligated under the settlement

---

[3]    Public Utilities Code section 5800 et seq. The parties' briefs and the trial court's rulings refer to this Act by the acronym DIVCA.

agreement to provide certain public buildings with cable modem service at no charge for as long as Charter provided video services within Glendale.

As to Glendale's first cause of action, and the cross-motions for summary adjudication, the trial court granted summary adjudication to Charter that it had no duty to provide free video programming or free cable modem services to Glendale. The trial court, however, denied summary adjudication on whether Charter had conveyed to Glendale a permanent right to possess or use the fiber capacity that made up the I-Net on the ground that there were triable issues of fact on this issue.

**B.      Trial**

Following the trial court's rulings on the parties' summary judgment and summary adjudication motions, the following issues remained for trial on the merits:  Charter's request for a declaration concerning its continuing duty to provide free I-Net services; Charter's claim for recovery of the I-Net and damages for past use of the I-Net; Glendale's claim that Charter had given it a permanent right of possession or use of the I-Net—part of the first and second causes of action in Charter's cross-complaint—and Charter's request for a declaration that Glendale had used PEG fees for operating costs and therefore had collected from Charter an unlawful franchise fee—the fourth cause of action in Charter's cross-complaint.  A trial ensued, after which the trial court rendered a statement of decision.[4]  Set forth below are the pertinent portions of the trial court's findings of fact after trial.

*1.      I-Net Obligations*

On or about September 7, 1999, Charter and Glendale entered into a settlement agreement that resolved disputes over the change of control and franchise compliance issues that had arisen between the parties, including the dispute over the unfinished I-Net. The trial court found that Charter had not conveyed to Glendale a permanent right to

---

[4]      The trial court in its minute order discussing the motions for summary adjudication and in its statement of decision thoroughly addressed the issues.

possess or use the I-Net. In that connection, the trial court considered the following evidence and made the following findings.

a. The Parties' Understanding of the Meaning of the
I-Net Provision in the Settlement Agreement

Glendale argued that notwithstanding the absence of any conveyance or dedication language in the settlement agreement itself, the parties to that agreement had a "mutual understanding" that Charter was giving to Glendale an indefeasible right of use for certain portions of the fiber contained in Charter's cable system. The trial court found, however, that Glendale had introduced no evidence of such an understanding or agreement. The trial court also ruled that Charter could not obtain an order entitling it to recover property related to the I-Net or compensation for Glendale's use of fiber capacity.[5]

Two of Charter's witnesses who were involved in the negotiations testified that prior to the parties' execution of the settlement agreement, Glendale did not ask that Charter provide it with ownership of, or an indefeasible right of use of, some portion of its cable system for purposes of Glendale's I-Net. Nor, according to that testimony, did Charter agree to such transfer. Rather, both witnesses understood that Charter was agreeing in the settlement agreement only to give to Glendale the right to use capacity on Charter's cable system for the remaining term of the Glendale franchise or any extension of that franchise term.

According to the trial court, Glendale did not contradict this testimony with any credible evidence. Glendale's witness, Ms. Christine Sansone, a Glendale employee, testified that she understood that under the settlement agreement, Glendale would have some sort of indefeasible right to use the I-Net fiber optic cable. Yet, when the trial court asked her directly whether there "was any discussion regarding what we have called ownership or—ownership of the fibers"—or whether Charter represented that it would

---

[5] The issues of recovery of property and damages are not subjects of this appeal.

8

"dedicate the fibers to the City," Ms. Sansone responded that she did not recall those words ever being used in the negotiations.

Moreover, two staff reports prepared by Ms. Sansone and submitted to the Glendale City Council were inconsistent with her trial testimony that an agreement was reached by the parties for Charter to give to Glendale some form of ownership interest or perpetual right to occupy and use portions of Charter's cable system. Both reports were prepared long before the commencement of this litigation. The first report was dated September 7, 1999, after the terms of the settlement agreement had been finalized. In that report, Ms. Sansone described the primary terms of the agreement and recommended that Glendale's City Council approve it. In describing the results of the settlement agreement negotiations, the report mentioned the I-Net only in passing. That report stated that Charter "agreed to comply with the following Franchise requirements: . . . provide full return capacity from sites specified in Exhibit B."

The first report referred to the I-Net as a "franchise requirement" but said nothing about Glendale obtaining a permanent possessory interest to strands of optical fiber. Yet Ms. Sansone submitted a declaration in this lawsuit calling the "compete restructuring of the original institutional network requirement from a dedication of band width to the actual provision of physical fiber" one of the four "most critical provisions" of the settlement agreement. At trial, according to the trial court, Ms. Sansone was unable to reconcile credibly her declaration testimony with the absence in the staff report of any reference to Glendale's acquisition of I-Net fiber, and therefore the report undermined the credibility of Ms. Sansone's testimony about the parties' "mutual" understanding of the I-Net provisions.

A second staff report was submitted to the Glendale City Council in May 2006, when the California Legislature was considering enacting the State Cable Act. That staff report also was inconsistent with Ms. Sansone's testimony. In that staff report, Ms. Sansone advised the Glendale City Council that if the State Cable Act passed, Glendale "would no longer be able to require cable operators to provide institutional network lines and free cable services to public buildings." According to Ms. Sansone, the State Cable

9

Act "would preempt these requirements, eliminating [Glendale's] authority to require such lines." On that basis, she recommended that Glendale join in letters opposing the State Cable Act. The fact that the report did not state that Glendale had already acquired the right to use the I-Net in perpetuity was inconsistent with Ms. Sansone's testimony that Glendale had obtained such a right. The trial court concluded that Ms. Sansone's attempt to reconcile her current testimony with the contents of the May 2006 staff report was not credible.

 

           b.       The Structure and Maintenance of the I-Net Is
                        Consistent with Charter's Ownership

At the time of trial, Charter provided Glendale with the use of the I-Net by connecting 24 public buildings to Charter's cable system through fiber optic "cable drops." Four strands of optical fiber connected each building (other than the Perkins Building) to the system backbone. When those four fibers reached the backbone, they were spliced with fibers already in the backbone in a way that provided a continuous route to the Perkins Building, which fibers served as a hub for the I-Net. As they ran from one public building to another through Charter's distribution system, the I-Net fibers were contained in larger cables that also contained many other fiber strands that were used to serve other Charter customers. In other words, the I-Net was completely integrated into Charter's cable system. Charter was not required to use any particular fiber strands to provide I-Net connectivity. Charter could re-engineer its system and provide I-Net connectivity through different strands than the ones that were currently being used for that purpose. The trial court considered these facts as suggesting Charter's ownership of the I-Net.

 

           c.       The I-Net Is Not a "Fixture"

Charter's senior director of engineering testified that the sheaths that contain the fibers used exclusively by Glendale as part of the I-Net were contained within conduit in the ground or hung from utility poles. He testified that Charter could easily remove and

replace the fiber sheaths in its system at will, without destroying or damaging them or the rest of Charter's fiber network. In fact, according to the testimony, Charter periodically removed portions of fiber optic cable from where they were placed as part of cable relocation efforts or for a variety of other reasons. The testimony at trial persuaded the trial court that Charter could easily disconnect Glendale's I-Net from its fiber backbone, and use the fiber, which had been used exclusively by Glendale, to provide services to other paying customers. Glendale offered no persuasive testimony to the contrary. Accordingly, the trial court concluded that the I-Net was not a fixture.

### 2. PEG Fees

The trial court, in considering the following evidence and making the following findings, concluded that Glendale improperly used PEG fees.

### a. Glendale's New Cable Ordinance

After the enactment of the State Cable Act, Glendale adopted a new cable ordinance. It provided, in pertinent part, that: "A. Every state video franchise holder operating within the jurisdictional boundaries of the city shall calculate and remit to the city the following fees: [¶] 1. A franchise fee equal to five (5) percent of that state franchise holder's gross revenues; [¶] 2. A PEG access fee equal to two (2) percent of the gross revenues of that state video franchise holder which fee shall be used by the city for PEG purposes. [¶] B. . . . A late payment charge . . . will be applied to any payment due by a state video franchise holder when said fees are not received or underpaid." (Glendale Mun. Code, § 5.36.040.)

The regional vice president of Charter's western region testified that Charter paid franchise fees to Glendale in an amount equal to five percent of its "gross revenues" for the years 2008 through 2011. For that same period, Charter paid PEG fees equal to two percent of its "gross revenues."

11

b.     Glendale Creates a Lease to Avoid the Legal Restrictions
On the Use of PEG Fees

Glendale's primary governmental access channel was known as GTV-6. Glendale employees produced and broadcasted meetings of the Glendale City Council and other city agencies on GTV-6, as well as other city-produced programming. Since 1995, Glendale had used the PEG fees it received from Charter to pay operational costs associated with the operation of the PEG facilities based on waiver language it had required be included in the settlement agreement. The documents admitted at trial containing inter-departmental communications and minutes of the Glendale City Council established that Glendale was aware that with the passage of the State Cable Act and Charter's receipt of a state-issued franchise, Glendale could no longer use PEG fees to pay operating—as opposed to capital—expenses, unless it treated those fees as franchise fees subject to the maximum allowable amount under federal and state law of five percent.

In order to avoid the federal limitation on Glendale's use of PEG fees, Glendale developed a plan involving a lease agreement with a related party, the Glendale Financing Authority ("GFA"). The governing board of the GFA was comprised of the same people that made up the Glendale City Council. Glendale's city manager was the chief administrator of both the GFA and the Glendale City Council, and signed the lease agreement on behalf of both entities.

On or about June 15, 2010, the GFA board of directors—the Glendale City Council—adopted Resolution No. GFA10-03, which authorized the execution of a lease agreement with Glendale for Glendale's GTV-6 facilities and equipment (the GFA lease). The GFA lease was dated July 1, 2010. Pursuant to that lease, Glendale assigned to the GFA all future PEG fees that would be received by Glendale and the GFA then paid Glendale the same fees back as lease payments for the GTV-6 facilities and equipment used to produce programming for GTV-6. When Glendale received the PEG fees from Charter, they were placed into a capital account. The PEG access fees were then assigned to the GFA, which used those fees to pay Glendale the rental payments due

12

under the lease. The lease payments were transferred to Glendale's general fund and could be used for any purpose. The acknowledged purpose of the lease agreement was to allow Glendale to use PEG fees for operating expenses without having those fees being treated as franchise fees subject to the five percent limit.

It is undisputed that the GFA, which had no employees, did not actually make use of the facilities and did not participate in the production of GTV-6 programming. Instead, Glendale continued to occupy and use the facilities exactly as it had before the lease went into effect. In fact, there was no purpose for the GFA and the lease agreement other than to allow Glendale to assess a two percent PEG fee and relieve itself of the obligation to consider it as part of the allowable five percent franchise fee.

c. Inappropriate Reimbursement of Past Capital Costs

Glendale claimed that through the use of this leasing mechanism, it was reimbursing itself for capital expenditures previously made from the general fund on PEG facilities. In or about 2004, Glendale dedicated portions of previously-acquired real estate and buildings to construct and expand the GTV-6 facilities to include a studio and an auxiliary control room. The studio expansion was financed through unrestricted city funds. In or about 2010, Glendale commissioned a real estate appraisal by an independent member of the Appraisal Institute, who calculated the current fair market value of the real estate associated with the GTV-6 studio and the auxiliary control room to be $2,700,000. The same appraisal calculated an allocable portion of the fair market property value of the City Council chambers and a secondary meeting room, within which PEG programming was produced, to be $190,000. Accordingly, the land and buildings associated with Glendale's PEG programming was appraised at a total value of $2,890,000.

Around the same time in the beginning of 2010, Glendale conducted an internal asset valuation of (i) Glendale-owned specialized fixtures and equipment used in connection with PEG programming (e.g., cameras, lights, editing equipment); and (ii) the GTV-6 library, which consisted of a collection of over 3,000 governmental meetings and

13

over 800 Glendale-produced programs. The fair market value of the specialized fixtures and equipment was calculated to be $1,217,540, and the fair market value of the film library was calculated to be $1,723,900. The specialized fixtures and equipment and the development of the film library previously had been financed by unrestricted city funds. Glendale's objective in performing the internal asset valuation and obtaining the independent appraisal was to obtain a total current value of its PEG facilities and equipment—the construction and purchase of which were financed by unrestricted city funds—in the event that Glendale decided to recoup the fair market value attributable to its prior expenditures.

Pursuant to the State Cable Act and the Federal Cable Act,[6] Glendale may require the payment of a franchise fee. (47 U.S.C. § 542(a); Pub. Util. Code, § 5840, subd. (q).) The State Cable Act permits a local entity to establish a fee to support PEG access channel facilities so long as the fee is consistent with federal law. (Pub. Util. Code, § 5870, subd. (n).) The maximum allowable franchise fee under both federal and state law is five percent of a cable operator's gross revenue. (47 U.S.C. § 542(b); Pub. Util. Code, § 5840, subd. (q).) Under the Federal Cable Act, the definition of a franchise fee specifically excludes "capital costs" associated with PEG access facilities. (47 U.S.C. § 542(g)(2)(C).) Glendale had established a franchise fee and PEG fee requirement. As noted, under Glendale Municipal Code section 5.36.040, the required franchise fee was five percent of a cable operator's annual gross revenues, and the required PEG fee was two percent of a cable operator's annual gross revenue.

Although the capital costs—"costs incurred in or associated with the construction of PEG access facilities" (*In re Matter of Implementation of Section 621(A)(1) of the Cable Communications Policy Act of 1984 as Amended by the Cable Television Consumer Protection and Compensation Act of 1992* (2007) 22 F.C.C. Rcd. 5101, 5150 (FCC Report))—are not considered franchise fees, operating costs must be part of the franchise fee, which is subject to the five percent limit. Presumably, capital costs can be

---

[6]     Title 47 United States Code section 521 et seq.

recovered as PEG fees. Although the Federal Cable Act states that fees associated with capital costs for PEG access facilities are not considered franchise fees (47 U.S.C. § 542(g)(2)(C)), that statute does not define "capital costs."

The legislative history of the Federal Cable Act demonstrates that the term "facilities" was intended to refer to PEG channel capacity, as well as facilities and equipment for the use of such channel capacity. (H.R. Rep. No. 98-934, 2d sess., p. 45 (1984); *Alliance for Community Media v. F.C.C.* (6th Cir. 2008) 529 F.3d 763, 783-785 (*Alliance*).) Congress specified that "[t]his may include vans, studios, cameras, or other equipment relating to the use of public, educational, or governmental channel capacity." (H.R. Rep. No. 98-934, *supra,* at p. 45.)

The trial court interpreted the "capital costs" broadly. The trial court said the phrase "associated with," used by the FCC to describe capital costs, is broad in nature (*Natural Resources Defense Council v. U.S. E.P.A.* (9th Cir. 1992) 966 F.2d 1292, 1304) and that its use is coextensive with the phrase "related to." (See *Alliance, supra,* 529 F.3d at 783-785; *California Rice Industry v. Federal Trade Commission* (9th Cir. 1939) 102 F.2d 716, 721.) The trial court similarly concluded that the term "related to" is also broad and far reaching. (*Chiron Corp. v. Ortho Diagnostic Systems, Inc.* (9th Cir. 2000) 207 F.3d 1126, 1131.) Thus, according to the trial court, capital costs can be said to be those costs that are incurred in, or that pertain, concern, or bear a relation to, PEG channel capacity, facilities or equipment, or the construction thereof. (H.R. Rep. No. 98-934, *supra,* at p. 45; *Alliance, supra,* 529 F.3d at pp. 783-785.) The trial court assumed, without deciding, that Glendale could reimburse itself for past capital expenditures on PEG facilities by using current PEG fees, but found that Glendale had secured an appraisal of the current value of its PEG facilities and equipment without reference to their actual costs at the time they were incurred, i.e., what Glendale expended in 2004 to expand the GTV-6 facility.

The trial court concluded that Glendale could not, consistent with the proper definition of capital costs, charge as "capital" reimbursement amounts based on a current appraisal of all facilities, equipment, and library of broadcasts acquired over the years

regardless of when, and if, any funds were expended for such facilities, equipment, and library. The trial court said that although Glendale may be entitled to reimbursement of capital "costs" it had expended in connection with the PEG access channels and broadcasts, the calculation of such reimbursements by Glendale was flawed. Glendale's valuation was an improper method to calculate the GFA lease payments. Over the term of the lease, Glendale was paid not just the amount of its past general fund investments on GTV-6, but rather the entire present value of the GTV-6 facilities. In sum, there was no relationship between what Glendale spent in the past on capital costs and what it would receive in lease payments under the GFA lease. This, according to the trial court, defeated any claim that the payments were a reimbursement of past capital expenditures.

Moreover, much of the $5.8 million Glendale was seeking in "reimbursements" from PEG fee revenue was not money Glendale spent from the general fund on capital investments in the GTV-6 facilities. For example, $1.7 million of Glendale's stated value of the facilities came from the GTV-6 film library alone. That value was determined by estimating the amount it cost to pay city employees to record and edit the GTV-6 programs in the library. But, as a Glendale witness testified, those employees' salaries were paid primarily from PEG fees in the first instance, not from the general fund. Glendale's rationale was that it should be entitled to recover sums that were spent from the general fund on GTV-6 capital costs and were never recovered. The trial court found it would be inappropriate to include sums spent from PEG fee revenue, such as the $1.7 million used to pay employees to produce the film library, for the amount of reimbursement of the general fund.

d.      Disregarding the Lease

Charter's expert witness, Mr. Daniel Ray, was an expert in forensic accounting. Mr. Ray testified that, applying generally accepted accounting principles (GAAP),[7] PEG

---

[7]      "The GAAP are an amalgam of statements issued by the AICPA [American Institute of Certified Public Accountants] through the successive groups it has established to promulgate accounting principles:  the Committee on Accounting Procedure, the

fees were not being used for capital costs.  In support of this conclusion, Mr. Ray testified that (i) the lease agreement had no economic substance, (ii) the terms of the lease agreement did not represent economic reality and so would not have been agreed to by an unrelated party, (iii) the lease agreement was not a capital lease under GAAP, (iv) by its own admission, Glendale was using PEG fees to pay PEG operating expenses, and (v) the purported "reimbursement" was not a capital expenditure from an accounting perspective.  The facts upon which Mr. Ray relied in reaching these conclusions were largely undisputed.

With respect to the issue of whether the lease agreement had any economic substance, Mr. Ray testified that in related party transactions it is important—from an accounting standpoint—to look beyond the form of a transaction in order to confirm that there was economic substance to it.  If there was no such economic substance, the form must be disregarded and only the substance should be considered in determining the proper classification of PEG fee expenditures.  Factors that supported Mr. Ray's opinion that there was no economic substance to the lease agreement included the fact that neither Glendale nor the GFA was getting anything that it did not already have before the transaction or was giving up anything as a result of the transaction.  For example, Glendale was not giving up the occupancy and use of the lease facilities, and the GFA was not actually using or occupying them.  Although Glendale was purportedly assigning PEG fees to the GFA, the fees were deposited into the same checking account from which they came; were accounted for in the same special revenue fund into which the fees had always been deposited; and were returned in their entirety to Glendale as so-called "lease payments."  Mr. Ray also testified that the lease agreement presented no real risk to either party.

Further underscoring the lack of economic substance behind the lease agreement, Mr. Ray identified a number of ways in which the terms of the lease, or the "form of the transaction," were, in effect, divorced from reality.  For example, under the terms of the

Accounting Principles Board, and the Financial Accounting Standards Board."  (*Bily v. Arthur Young & Co.* (1992) 3 Cal.4th 370, 382.)

lease agreement, the GFA was "to take possession" of the GTV-6 facilities as of July 1, 2010, and would have the "use" and "enjoyment" of them. As noted above, however, it was undisputed that the GFA did not actually occupy or otherwise make use of the GTV-6 facilities. Instead, the same city employees who worked for GTV-6 before the lease agreement remained employees of Glendale and reported to work at the same location and continued to perform the same tasks after the lease agreement went into effect.

As another example, the lease agreement provided that the GFA was supposed to pay, in addition to the lease payments, certain expenses such as the fees and expenses of attorneys; consultants; accountants; and all utility services, including janitor service, security, power, gas, telephone, light, heating, and water. It was undisputed, however, that the GFA did not make any such payments.

Under the terms of the lease agreement, the GFA was to deposit promptly all PEG fees received into a "PEG Lease Payment Fund" established by the GFA. But, it was undisputed that the GFA did not open any such account.

Mr. Ray also testified that the terms set forth in the lease agreement were not based upon economic reality and would not have been agreed to by an unrelated party because they were premised on a valuation of the GTV-6 facilities that was highly suspect. In support of this conclusion, Mr. Ray pointed to a number of components of the overall value used by Glendale ostensibly to determine an appropriate rental rate. Specifically, he expressed questions and concerns, from a forensic accounting perspective, about the fact that Glendale (i) valued all of the equipment at its original cost rather than its current value, (ii) rejected the original appraisal report it had obtained employing a "fair value" analysis in favor of a second, significantly higher appraisal, which employed a "special use value" analysis, (iii) assigned a value to the film library based upon the cost to create it, rather than the price someone would be willing to pay for it, and (iv) included within the parameters of the "leased facilities" portions of the Glendale City Council chambers. The fact that the lease terms were not based on economic reality provided further support for disregarding the form of the lease, looking to the substance of the lease transaction, and concluding that lease was a "sham."

18

In addition, Mr. Ray discussed the issue of whether the lease agreement was a capital lease or an operating lease. The evidence on this issue was not disputed. Both Mr. Ray and Mr. Robert Elliot, Glendale's director of finance, agreed that (i) all leases are either capital leases or operating leases, (ii) if there is an effective transfer of title at the end of the lease term, then the lease is a capital lease, (iii) if there is no transfer of title at the end of the lease term, then the lease is an operating lease, and (iv) payments made on a capital lease are capital expenses, while payments made on an operating lease are operating expenses. On its face, the lease agreement did not include a transfer of title at the end of the lease term. Thus, the payments by the GFA should not be considered "capital" reimbursements, even if the lease was determined to be more than a mere shell mechanism to continue requiring the PEG fee payments from Charter.

The only witness Glendale provided to respond to Mr. Ray's testimony was Mr. Elliot. When Mr. Elliot was asked specifically by the trial court whether Mr. Ray's opinions were wrong, he was unable or unwilling to say whether Mr. Ray was right or wrong. Moreover, Mr. Elliot admitted that if he were going to determine whether something was a capital cost or an operating cost, he "would apply the same criteria that Mr. Ray applied" in his testimony. Mr. Elliot was the only witness called by Glendale to testify on accounting issues related to the expenditure of PEG fees. Yet, he never testified that PEG fees were being spent on capital costs. Taking this testimony together with the other evidence described above, the trial court found that Glendale was not using the PEG fees it received from Charter for PEG capital costs.

### e.     Trial Court's Conclusions and the Appeal

Following a court trial, the trial court issued a statement of decision that included the factual findings detailed above, and ruled that Glendale had no ownership interest in the I-Net and Charter had no continuing duty to provide free I-Net services and facilities. The trial court also ruled in favor of Charter on the PEG issue, ruling that Charter was entitled to a declaration that (i) Glendale was using PEG fees for purposes other than capital costs associated with PEG channel facilities and such use was prohibited under

19

the State Cable Act and the Federal Cable Act because Glendale was collecting a franchise fee in excess of the five percent limit; and (ii) any use of PEG fees by Glendale for any purposes other than capital costs was prohibited under the State Cable Act and the Federal Cable Act, unless such fees were treated as part of a franchise fee subject to the five percent limit.

Charter filed an appeal as to the summary adjudications against it. Glendale cross-appealed as to the summary adjudication against it and as to that part of the judgment based on the trial court's decisions following trial.

## DISCUSSION

### A. Charter's Appeal

#### 1. Standard of Review

Charter's appeal raises two challenges to the trial court's orders granting Glendale's cross-motions for summary adjudication of the third and fifth causes of action in Charter's amended cross-complaint. Because those challenges are based on undisputed facts and involve the interpretation of state and federal statutes, we review the summary adjudications de novo.

As stated in *Araquistain v. Pacific Gas & Electric Co.* (2014) 229 Cal.App.4th 227, 231 (*Araquistain*), "The standard of review of a summary judgment motion in favor of a defendant is well settled. We 'independently assess the correctness of the trial court's ruling by applying the same legal standard as the trial court in determining whether any triable issues of material fact exist, and whether the defendant is entitled to judgment as a matter of law.' [Citation.] Here, the dispositive facts are undisputed, and the question is one of statutory interpretation. 'It is well settled that the interpretation and application of a statutory scheme to an undisputed set of facts is a question of law [citation] which is subject to de novo review on appeal. [Citation.]' [Citation.]" (See *Davis v. Kiewit Pacific Co.* (2013) 220 Cal.App.4th 358, 363 ["In reviewing an order

20

granting summary adjudication of an issue, we apply the same de novo standard of review that applies to an appeal from an order granting summary judgment"].)

### 2. *Declaration of Right of Offset*

Charter contends that the trial court erred when it granted Glendale's cross-motion for summary adjudication of Charter's fifth cause of action for a declaration that Charter had a right to offset the amount of its PEG fee overpayments against its future franchise fee payments. According to Charter, its right to offset overpayments was authorized expressly by section 5860, subdivision (h) of the State Cable Act,[8] and its request for a declaration of rights did not contravene the prohibition against damage actions in section 555a(a) of the Federal Cable Act (47 U.S.C. § 555a(a)). The trial court ruled that the declaration Charter sought would be contrary to federal law.

Whether under Public Utilities Code section 5860, subdivision (h) Charter's claim involves an "overpayment" and a deduction "from its next quarterly statement" are issues we do not have to decide. Assuming, without deciding, that Charter's right to offset past PEG fee overpayments against future franchise fees is authorized under section 5860, subdivision (h) of the State Cable Act, Charter's request for a judicial declaration confirming that right nevertheless contravenes the prohibition against damage actions in section 555a(a) of the Federal Cable Act. That section provides, in pertinent part: "(a) *Suits for damages prohibited*. In any court proceeding pending on or initiated after the date of enactment of this section [Oct. 5, 1992] involving *any claim against a franchising authority* or other governmental entity, or any official, member, employee, or agent of

---

[8]    Public Utilities Code section 5860, subdivision (h) provides: "The state franchise fee shall be remitted to the applicable local entity quarterly, within 45 days after the end of the quarter for that calendar quarter. Each payment shall be accompanied by a summary explaining the basis for the calculation of the state franchise fee. If the holder does not pay the franchise fee when due, the holder shall pay a late payment charge at a rate per year equal to the highest prime lending rate during the period of delinquency, plus 1 percent. *If the holder has overpaid the franchise fee, it may deduct the overpayment from its next quarterly payment*." (Italics added.)

21

such authority or entity, arising from the regulation of cable service or from a decision of approval or disapproval with respect to a grant, renewal, transfer, or amendment of a franchise, any relief, to the extent such relief is required by any other provision of Federal, State, or local law, *shall be limited to injunctive relief and declaratory relief.*" (47 U.S.C. § 555a(a), italics added.)

As the court explained in *Jones Intercable of San Diego v. City of Chula Vista* (9th Cir. 1996) 80 F.3d 320, "Congress found that, prior to passage of section 555a(a), municipalities were facing unexpected and 'potentially crippling' civil damage liability claims in relation to their regulation of cable operators. (Footnote omitted.) *See Daniels Cablevision, Inc. v. United States,* 835 F.Supp. 1, 11-12 (D.D.C. 1993). In response, Congress exempted municipalities from civil damages liability arising out of the local regulation of cable services in order 'to preserve the municipal franchising and regulation scheme envisioned by the [Cable Communications Policy Act of 1984].' *Id.* at 12. [¶] We conclude that section 555a(a) promotes Congress's substantial interest in having municipalities regulate cable operators without fear of potentially overwhelming damage awards. The statute is aimed at improving Congress's scheme for regulating cable systems . . . ." (*Id.* at p. 326.)

As Glendale points out, Charter originally sought damages and reimbursement based on its claim that Glendale had unlawfully expended PEG fees. When Glendale raised the damages prohibition in section 555a(a) of the Federal Cable Act (47 U.S.C. § 555a(a)) in response to Charter's claim for damages and reimbursement, Charter amended its cross-complaint by deleting the express request for damages and reimbursement and replacing it with a request for a declaration that it had a future right of offset based on past overcharges of PEG fees. According to Glendale, the change in the relief that Charter sought from legal to equitable remedies was merely a pleading artifice designed to circumvent the damage prohibition in section 555a(a) of the Federal Cable Act. (47 U.S.C. § 555a(a).) We agree.

The label attached to a complaint or a cause of action does not control. (*Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 845 [when classifying an action as

legal or equitable, courts look to the substance of the action—nature of rights in issue and remedy sought].) Although Charter labeled its first cause of action as one for declaratory relief, the underlying purpose of that claim was to obtain a declaration that Glendale was obligated to repay or reimburse Charter for alleged past overpayments of PEG fees. Leaving aside the issue of whether a declaration of rights based, in part, on past events, is appropriate, Charter's requested declaration would result in a judicially recognized right of offset, the practical effect of which would be the recoupment of money allegedly wrongfully obtained from Charter by Glendale, i.e., the recovery of damages. "Whatever their semantic differences, the statutory and dictionary definitions of 'damages' share several basic concepts. Each requires there to be 'compensation,' (footnote omitted) in 'money,' 'recovered' by a party for 'loss' or 'detriment' it has suffered through the acts of another." (*AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 826.) We therefore conclude that the trial court correctly determined that Charter's request for a declaration of a right of offset contravened the prohibition against damages in section 555a(a) of the Federal Cable Act. (47 U.S.C. § 555a(a).) The trial court did not err in summarily adjudicating against Charter its request for a declaration of a right of offset.

### 3. *Request to Realign PEG Channels*

Charter contends that the trial court erred when it granted Glendale's motion for summary adjudication of the third cause of action in Glendale's cross-complaint for declaratory relief regarding Charter's right to realign Glendale's PEG channels. According to Charter, the trial court erred when it ruled that Glendale could withhold arbitrarily its approval of the request to realign its PEG channels under section 5870, subdivision (b) of the State Cable Act.[9] For the first time, Charter argues on appeal that

---

[9] Public Utilities Code section 5870, subdivision (b) provides: "The PEG channels shall be for the exclusive use of the local entity or its designee to provide public, educational, and governmental channels. The PEG channels shall be used only for noncommercial purposes. However, advertising, underwriting, or sponsorship recognition may be carried on the channels for the purpose of funding PEG-related activities. The PEG channels shall all be carried on the basic service tier. To the extent

23

statutes conferring discretion on local government entities necessarily embody a reasonableness requirement. As it did in the trial court, Charter also asserts that Glendale was required, under principles of contract law, to have a reasonable basis for rejecting Charter's request to realign Glendale's PEG channels.

Charter concedes that it did not argue specifically in the trial court that statutes, such as Public Utilities Code section 5870, subdivision (b), which confer discretion on a governmental entity necessarily embody a reasonableness requirement. Instead, it claimed that contract principles required that a reasonableness element must be read into Glendale's right to approve by agreement any channel number changes proposed by Charter. Charter argues that the trial court necessarily rejected a statutory reasonableness requirement by ruling that the statute clearly provided that PEG channel numbers could not be changed without the agreement of the local entity. But Charter did not argue, as it does now, that the statute itself impliedly requires the local entity to act reasonably in deciding whether to agree to a channel change. By failing to make this argument before the trial court, Charter has forfeited the contention.

The Supreme Court in *Keener v. Jeld-Wen, Inc.* (2009) 46 Cal.4th 247 (*Keener*) explained the basis for the forfeiture rule as follows: "The forfeiture rule generally applies in all civil and criminal proceedings. [Citations.] The rule is designed to advance efficiency and deter gamesmanship. As we explained in *People v. Simon* (2001) 25 Cal.4th 1082 . . . : """The purpose of the general doctrine of waiver [or forfeiture] is to encourage a defendant to bring errors to the attention of the trial court, so that they may be corrected or avoided and a fair trial had . . . .""' [Citation.] "'No procedural principle is more familiar to this Court than that a *constitutional* right," or a right of any other sort, "may be forfeited in criminal as well as civil cases by the failure to make timely assertion

_____

feasible, the PEG channels shall not be separated numerically from other channels carried on the basic service tier and the channel numbers for the PEG channels shall be the same channel numbers used by the incumbent cable operator unless prohibited by federal law. *After the initial designation of PEG channel numbers, the channel numbers shall not be changed without the agreement of the local entity unless the change is required by federal law. . . .*" (Italics added.)

of the right before a tribunal having jurisdiction to determine it." . . .' [Citation.] [¶] 'The rationale for this rule was aptly explained in *Sommer v. Martin* (1921) 55 Cal.App. 603 at page 610 [204 P. 33] . . . : "'In the hurry of the trial many things may be, and are, overlooked which would readily have been rectified had attention been called to them. The law casts upon the party the duty of looking after his legal rights and of calling the judge's attention to any infringement of them. If any other rule were to obtain, the party would in most cases be careful to be silent as to his objections until it would be too late to obviate them, and the result would be that few judgments would stand the test of an appeal.'"" [Citation.]" (Fn. omitted; [citations].)' [Citation.]" (*Id.* at pp. 264-265.)

Because Charter argued in the trial court only that contract principles—as opposed to principles of statutory interpretation—required Charter to provide a reasonable basis for its refusal to approve the proposed channel realignment, both Glendale and the trial court were deprived of the opportunity to address that discrete issue. Accordingly, Charter has forfeited that argument by failing to raise it in the trial court.

Even if the issue was not forfeited, we conclude that the refusal of Glendale to consent was lawful. Despite the statutory requirement that Charter obtain the agreement of Glendale to the channel realignment, Charter indicated it was proceeding with that realignment without seeking any relief from the City Council or judicial relief—e.g., petitioning for a writ of mandamus. It was at that point that Glendale sought and obtained injunctive relief.

The Legislature provided for the fundamental policy that PEG channels not be realigned unless the local entity agreed. (Pub. Util. Code, § 5870, subd. (b).) The Legislature did not delegate to the local entity the discretion to determine PEG channel changes, but rather provided that there would be no channel changes without the consent of the local entity.

The Legislature may provide for the consent or agreement of interested parties to an application of the statute or regulation. (See *Kugler v. Yocum* (1968) 69 Cal.2d 371, 379-380; *Brock v. Superior Court* (1937) 9 Cal.2d 291, 299.) In "a proper case," (*Williamson v. Madera Community Hospital* (1983) 144 Cal.App.3d 436, 442) when the

25

Legislature delegates its power, standards may be implied by the statutory purpose to avoid arbitrary action. (*People v. Wright* (1982) 30 Cal.3d 705, 712-713; *Kugler v. Yocum, supra,* 69 Cal.2d at pp. 376, 379-381 ["[The] most perceptive courts are motivated much more by the degree of protection against arbitrariness than by the doctrine about standards"]; *Brock v. Superior Court, supra,* 9 Cal.2d at p. 298; *People ex rel. Lockyer v. Sun Pacific Farming Co.* (2000) 77 Cal.App.4th 619, 633.)

Because the Legislature determined that there be no PEG channel realignment after the initial designation of PEG channels without the agreement of the local entity, it is questionable if there was a delegation of authority that required any type of protection for the cable operator. The California Supreme Court said, "The granting of discretionary power, not restricted by specific standards" can be appropriate if the objectionable activity is to "be regulated or restricted to certain localities." (*In re Petersen* (1958) 51 Cal.2d 177, 184.) In licensing situations, the licensing agency may not "act arbitrarily or oppressively." (*Id.* at p. 185.) "[I]t is presumed that the agency will duly perform its public duty, but an abuse may be shown and relief obtained in the courts." (*Ibid.*) Here, however**,** a traditional licensing issue is not involved.

Even if Glendale's action in refusing realignment is subject to challenge as being arbitrary, we conclude, as a matter of law, that such refusal was not arbitrary. (See *County of Los Angeles v. City of Los Angeles* (2013) 214 Cal.App.4th 643, 654 ["In determining whether a public agency has abused its discretion, the court may not substitute its judgment for that of the agency, and if reasonable minds may disagree as to the wisdom of the agency's action, its determination must be upheld. [Citation.] A court must ask whether the public agency's action was arbitrary, capricious, or entirely lacking in evidentiary support . . ."]; *O.W.L. Foundation v. City of Rohnert Park* (2008) 168 Cal.App.4th 568, 596; *County of Del Norte v. City of Crescent City* (1999) 71 Cal.App.4th 965, 976-978.) Glendale gave as reasons for not agreeing to a PEG channel realignment that it did not want to risk viewership loss—a possibility according to experts and market surveys—and a possible degradation of picture quality. In addition, both the Glendale Unified School District and Glendale Community College that

managed and administered a PEG educational channel opposed the realignment of that channel.[10]

Although Charter disputes Glendale's reasons, Glendale's position was not arbitrary because Glendale had evidence supporting its concerns and the risk of negative consequences. Accordingly, for all of the above reasons, we affirm the trial court's decision granting summary adjudication to Glendale on the PEG channel realignment issue.[11]

On the contract issue, we disagree with Charter's argument that contract principles impose an implied reasonableness requirement on Glendale's statutory right under Public Utilities Code section 5870, subdivision (b) to approve any proposed realignment of its PEG channels. At the time Charter proposed the PEG channel realignment, Charter was not operating under a local franchise agreement with Glendale; it was instead operating under a state franchise agreement entered into under the authority of the State Cable Act. As a result, Glendale's exercise of its statutory discretion under section 5870, subdivision (b) was not subject to any contract between Charter and Glendale from which a reasonableness requirement could be implied. Rather, Glendale's exercise of discretion was pursuant to a statute, and we have discussed Glendale's rights and obligations under the statute. Accordingly, the trial court did not err in concluding that Glendale did not have a contractual duty to demonstrate a reasonable basis for refusing to approve Charter's PEG channel realignment request.

---

[10] Under federal law, a cable operator must place the signal of a local commercial television station as the "over the air" channel on which the local commercial television station is broadcast, or on a channel on which it was carried on specified dates at the election of the station, unless the station and cable company mutually agree otherwise. (47 U.S.C. § 534(b)(6); 47 C.F.R. § 76.57(a).)

[11] To the extent the trial court in granting summary adjudication did not rely on any of the grounds we discuss, we may nevertheless still affirm the summary adjudication on any one or more of those grounds. (*American Meat Institute v. Leeman* (2009) 180 Cal.App.4th 728, 747-748.)

**B.      Glendale's Cross-Appeal**

Glendale cross-appeals from the trial court's summary adjudication of Charter's claim that Charter had no continuing duty to provide Glendale with free video programming and cable modem services, and the trial court's decisions after trial that Charter had no obligations to provide to Glendale use of the I-Net indefinitely without cost and that Glendale had charged Charter unlawful PEG fees.

*1.      Summary Adjudication*

a.      Standard of Review and Summary Adjudication of
Part of a Cause of Action

Glendale's cross-appeal raises, inter alia, a challenge to the trial court's order granting Charter's motion for summary adjudication of the first cause of action in Charter's cross-complaint. Because that challenge is based on undisputed facts and involves the interpretation of the State Cable Act and the parties' franchise and settlement agreements, we review it de novo. (See *Sacks v. City of Oakland* (2010) 190 Cal.App.4th 1070, 1082; *Araquistain, supra,* 229 Cal.App.4th at p. 231.)

Following our review of the trial court's ruling on the parties' cross-motions for summary adjudication on Charter's first cause of action, we requested that the parties submit letter briefs on whether the trial court's ruling adjudicating part, but not all, of that cause of action violated Code of Civil Procedure section 437c, subdivision (f).[12] (See

---

[12]      Code of Civil Procedure section 437c, subdivision (f) (1) provides: "A party may move for summary adjudication as to one or more causes of action within an action, one or more affirmative defenses, one or more claims for damages, or one or more issues of duty, if that party contends that the cause of action has no merit or that there is no affirmative defense thereto, or that there is no merit to an affirmative defense as to any cause of action, or both, or that there is no merit to a claim for damages, as specified in Section 3294 of the Civil Code, or that one or more defendants either owed or did not owe a duty to the plaintiff or plaintiffs. *A motion for summary adjudication shall be granted only if it completely disposes of a cause of action*, an affirmative defense, a claim for damages, or an issue of duty." (Italics added.)

28

*McCaskey v. California State Automobile Assn.* (2010) 189 Cal.App.4th 947, 975.) In its letter brief, Charter contends that the trial court properly granted partial summary adjudication of the first cause of action as to the free video programming and cable modem services issue, while the trial court denied partial adjudication of that part of the first cause of action concerning the free use of the I-Net services and facilities issue. Charter relies on the decision in *Lilienthal & Fowler v. Superior Court* (1993) 12 Cal.App.4th 1848, which held that a party may move for summary adjudication as to an alleged wrongful act in a cause of action so long as the act is separate and distinct from another alleged wrongful act included in the same cause of action. According to Charter, because the I-Net issue was based on a wrongful act that was separate and distinct from the wrongful act underlying the free video programming and cable modem issue, the trial court did not violate section 437c, subdivision (f). Charter further argues that even if the trial court's order contravened section 437c, subdivision (f) by summarily adjudicating only part of a cause of action, any such error was harmless because neither party suffered prejudice from the error.

In its letter brief, Glendale contends that the trial court's order summarily adjudicated only part of the first cause of action in violation of section 437c, subdivision (f). But Glendale maintains that because the free video programming and cable services issue presents a pure question of law, we can decide it as part of the appeal.

Although the trial court's order summarily adjudicating, in part, Charter's first cause of action may have violated Code of Civil Procedure section 437c, subdivision (f) because it failed to dispose of the entire cause of action, we agree with Charter that under the circumstances of this case, neither party was prejudiced by that error and therefore there was no miscarriage of justice requiring a reversal. (Cal. Const., art. 6, § 13.) After trial, the trial court adjudicated the I-Net issue in favor of Charter and then entered judgment on the *entire* first cause of action in favor of Charter based on its prior summary adjudication order with respect to that claim, thereby curing, after the fact, any defect in the summary adjudication ruling. Glendale's appeal from the judgment on the

29

first cause of action raised the issues relating to the summary adjudication ruling on that claim, as well as the trial court's ruling on that claim following trial of the I-Net issue.

### b. Analysis

Glendale challenges the trial court's ruling that although Charter and Glendale engaged in negotiations for an extension of the Glendale franchise agreement, no such agreement was reached and therefore Charter had no continuing duty to provide Glendale with free video programming and cable modem services. Because Charter had no such continuing duty to provide Glendale with free video programming and cable modem services, the trial court did not err in making that ruling. The settlement agreement's obligation to provide high-speed internet access and modem capability lasted only as "long as the Franchisee [Charter] . . . provide[s] Cable Service within the City pursuant to the [Glendale franchise agreement] or any renewal or extension thereof."

It was undisputed that the Glendale franchise agreement expired in 2005 and that although the parties negotiated about a renewal of that franchise, they did not reach a final agreement on a renewal. Charter thereafter provided cable services in Glendale under a state franchise agreement effective January 2008. As a result, any obligation under the Glendale franchise agreement as modified by the settlement agreement terminated as a matter of law in January 2008. The trial court therefore correctly granted Charter's motion for summary adjudication as to that part of the first cause of action related to the free cable programming and cable modem services issue.

### 2. *Trial*

### a. Standard of Review

Glendale maintains that because its challenges to the trial court's rulings after trial on the I-Net and PEG fees issues involve only contract and statutory interpretation, the governing standard of review is de novo. Charter counters that because the trial court's rulings on those two issues were based on detailed factual findings made after trial, the

30

substantial evidence standard governs Glendale's appeal from those rulings. As discussed below, we agree that the I-Net and PEG fees issues are based on facts and therefore the substantial evidence standard of review would govern any properly raised challenge to the sufficiency of the evidence in support of the trial court's findings.

The application of the substantial evidence standard of review has been summarized as follows: "'Where findings of fact are challenged on a civil appeal, we are bound by the "elementary, but often overlooked principle of law, that . . . the power of an appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted," to support the findings below. [Citation.] We must therefore view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor in accordance with the standard of review so long adhered to by this court.' [Citation.] 'Substantial evidence' is not synonymous with 'any' evidence; rather, it means the evidence must be of ponderable legal significance, reasonable, credible, and of solid value. [Citation.] An appellate court presumes in favor of the judgment or order all reasonable inferences. [Citation.] If there is substantial evidence to support a finding, an appellate court must uphold that finding even if it would have made a different finding had it presided over the trial. [Citations.] An appellate court does not reweigh the evidence or evaluate the credibility of witnesses, but rather defers to the trier of fact. [Citations.] 'The substantial evidence [standard of review] applies to both express and implied findings of fact made by the superior court in its statement of decision rendered after a nonjury trial.' [Citation.]" (*Cahill v. San Diego Gas & Electric Co*. (2011) 194 Cal.App.4th 939, 957-958.)

### b. Indefinite I-Net Obligations

Glendale contends that the trial court erred when it found that there was no agreement between the parties to allow Glendale to use indefinitely the dark fiber optic cables in the I-Net without cost. According to Glendale, the parties negotiated a "business deal" in connection with the settlement agreement that allowed it to use the

31

dark fiber optic cables in the I-Net without cost and, notwithstanding the provisions of the State Cable Act and Charter's state franchise agreement, that "deal" remained valid and enforceable.

As noted above, Glendale contends that the I-Net issue should be reviewed de novo because it involves an interpretation of the settlement agreement, as well as an interpretation of the State Cable Act. The purported agreement upon which Glendale relies, however, admittedly was an oral one supposedly made during the parties' negotiations of the franchise compliance issues that ultimately gave rise to the settlement agreement. The alleged existence of such an agreement raised a factual issue, not an issue of contract interpretation. Moreover, conflicting parol evidence was introduced concerning the intention of the parties, making the interpretation of the settlement agreement subject to the substantial evidence standard of review. (*Winet v. Price* (1992) 4 Cal.App.4th 1159, 1165-1166.)

As Charter points out, Glendale's argument ignores the detailed findings made by the trial court on this issue, including its finding that the parties never agreed to allow Glendale to have indefinite use of the dark fiber optic cables in the I-Net. Glendale raises no challenge to those findings based on insufficiency of the evidence in support of them, but rather relies on its erroneous view that the standard of review is de novo. As the trial court expressly found, Charter's witnesses on this issue testified that no such agreement for indefinite use was ever discussed, much less agreed upon, by the parties. In making that finding, the trial court on the issue found Charter's witnesses credible and Glendale's witness not credible. Because Glendale has not challenged the sufficiency of the evidence in support of those findings, it has, in effect, conceded that they were supported by substantial evidence and are therefore binding on appeal.

Given that the trial court's finding of no agreement to indefinite use of the dark fiber optic cables in the I-Net, Glendale is foreclosed from contending, as it does on appeal, that the parties orally agreed to such indefinite use. Because all of Glendale's appellate arguments on this issue are predicated on the existence of such an oral agreement, Glendale has failed to carry its burden of affirmatively demonstrating error on

appeal. (*Mark Tanner Construction, Inc. v. HUB Internat. Ins. Services, Inc.* (2014) 224 Cal.App.4th 574, 578 [appellants who failed adequately to challenge the legal bases or factual findings of the trial court "failed to carry their burden to demonstrate error"].)

### c.    PEG Fees

Glendale challenges the trial court's ruling that Glendale had charged an unlawful franchise fee by spending PEG fees on PEG operating costs, contending that Charter lacked standing to contest the PEG fees and that Glendale's lease arrangement with the GFA satisfied the Federal Cable Act's requirement that PEG fees must be expended on "capital costs." (47 U.S.C. § 542(g).) Glendale also asserts that Charter's expert improperly relied on GAAP in determining that Glendale was not expending the PEG fees it received from Charter on capital costs.

As the trial court determined during the summary adjudication proceedings, Charter had standing to challenge the PEG fees issue. The cases on which Glendale's standing argument is based, such as *Scol Corp. v. City of Los Angeles* (1970) 12 Cal.App.3d 805 (*Scol*),[13] involved plaintiffs who challenged a tax, but who were not taxpayers under the challenged statute. In *Scol,* the plaintiff retailer of alcoholic beverages challenged a municipal tax on the alcoholic beverages that it sold. The court in *Scol* held that because the statute imposed the tax directly on the consumer and made the retailer responsible for collecting the tax from the consumer, the retailer lacked standing to challenge the tax. (*Id.* at pp. 808-809.)

---

[13]    Glendale also cites *Torres v. City of Yorba Linda* (1993) 13 Cal.App.4th 1035 (*Torres*). That case rejected the plaintiffs' claim that they had taxpayer standing under Code of Civil Procedure section 526a to challenge a city's proposed amended redevelopment project because they had paid a sales tax in the city. The court said that the payment of a sales tax does not confer standing on a consumer because the tax is imposed on the retailer and not the consumer. That case involved an effort to bring a taxpayer action to challenge a city's action and is not relevant to the standing issue here. (See also *Coral Construction, Inc. v. City and County of San Francisco* (2004) 116 Cal.App.4th 6, 15, fn. 10, questioning *Torres.*)

As stated in *Sipple v. City of Hayward* (2014) 225 Cal.App.4th 349, 359 (*Sipple*), "*Scol* has since been criticized for its sharp distinction between a 'taxpayer' and a 'tax collector,' and its strict rule denying standing in all circumstances to 'tax collectors.' 'To the extent *Scol* stands for the proposition that a party lacks standing to challenge a tax unless it is the denominated "taxpayer" under the statutory or regulatory scheme imposing the tax, it is outdated.' (*TracFone Wireless, Inc. v. County of Los Angeles* (2008) 163 Cal.App.4th 1359, 1364 [78 Cal.Rptr.3d 466] (*TracFone*).) This is because '[t]here have been some refinements of the rule barring suits for refund to persons not technically regarded as "taxpayers" . . . resulting from unusual circumstances which have been subject to judicial review.' (*Delta Air Lines, Inc. v. State Bd. of Equalization* (1989) 214 Cal.App.3d 518, 526 [262 Cal.Rptr. 803] (*Delta*))." The court in *Sipple* analyzed the cases involving "unusual circumstances" as those that conferred standing on a tax collector in the interests of fairness and so that the taxing authority not be unjustly enriched. (*Sipple, supra,* 225 Cal.App.4th at pp. 359-361.)

We do not have to undertake the analysis applied in *Sipple, supra,* 225 Cal.App.4th at pages 359 through 361. In this case, the Glendale ordinance that imposed the PEG fee required the video franchise holder, i.e., Charter, to calculate and remit to Glendale a PEG fee of two percent of gross annual revenues. Although Charter passed the PEG fees through to its customers, it was nevertheless primarily liable under the ordinance for the calculation and payment of the fees. Because Charter was required to calculate and pay the PEG fees to Glendale in the first instance, Charter had standing to challenge the propriety of those fees.

Glendale's challenge to the merits of the trial court's ruling on the PEG fees issue suffers from the same defect as its challenge to the ruling on the I-Net issue. Glendale characterizes its challenge as a definitional one under section 542(g) of the Federal Cable Act (47 U.S.C. § 542(g)) concerning the meaning of the term "capital costs" in that section's definition of legitimate PEG fees. But that challenge, in effect, repeats Glendale's factual arguments in the trial court concerning the GFA lease arrangement, i.e., that Glendale's lease with a related entity was a bona fide transaction that allowed

34

Glendale to reimburse itself from future PEG fees for expenditures it had made in the past from its general fund on capital improvements to its GTV-6 studio and related facilities. The trial court, however, after taking testimony and considering exhibits, rejected those arguments and instead made detailed factual findings that the manner in which Glendale calculated the value of its past capital expenditures on its GTV-6 facilities was inappropriate.

According to the trial court's findings, "[t]here was no relationship between what Glendale spent in the past on capital and what it would receive in lease payments" because Glendale included in its calculation of past capital expenditures the "entire present value" of the GTV-6 studio and equipment, not the amount actually spent on those items. The trial court also found Glendale's calculation of the amount it was entitled to recoup on capital expenditures was inappropriate because Glendale included in that calculation the present value of the film library, including the cost of the salaries of the city employees who recorded and edited the programs in the library, salaries that the trial court found had been paid from PEG fees in the first instance, and not from the general fund as contended by Glendale.

Given the trial court's factual findings on the flawed calculation of past general fund expenditures on capital investments in the GTV-6 facilities and equipment— findings that Glendale does not challenge on appeal—Glendale has failed to demonstrate that the trial court erred in ruling that Glendale improperly calculated PEG fees.

The trial court also made unchallenged factual findings concerning the legitimacy of the GFA lease arrangement and concluded, as a factual matter, that the arrangement was a sham. The trial court based its findings, in part, on expert testimony concerning the economic substance of the lease arrangement. Relying in part on that testimony, the trial court found that the GFA lease was a related-party transaction and that "neither Glendale nor the GFA was getting anything it did not already have before the transaction, or was giving up anything as a result of the transaction." According to the trial court, Glendale was not giving up the occupancy or use of the lease facilities and the GFA was not actually using or occupying them. Moreover, the trial court found that the same

35

Glendale employees who worked for GTV-6 before the lease agreement remained employees of Glendale, reported to work at the same location, and performed the same tasks after the lease went into effect. In addition, the trial court found that although the GFA was required under the lease to pay certain expenses in addition to lease payments, the GFA never paid any such expenses.

Glendale has, in effect, conceded that the trial court's factual findings in support of its conclusion that the GFA lease was a sham were supported by substantial evidence. Thus, it has failed to carry its burden of demonstrating error with respect to that conclusion. Because, as a factual matter, the lease was a sham, the trial court correctly concluded that the lease arrangement did not support Glendale's assertion that its expenditure of PEG fees was on capital costs, rather than on operating costs. Thus, the expenditure of PEG fees on operating costs violated the Federal Cable Act's five percent limitation on the amount of franchise fees that Glendale could lawfully collect.

Glendale argues that Charter's forensic accounting expert mistakenly relied on GAAP concerning the meaning of "capital costs" to arrive at his conclusion, instead of the FCC definition discussed in cases such as *Alliance, supra,* 529 F.3d at pages 783 through 785. Glendale asserts that because the trial court erroneously used GAAP, Glendale can attack the trial court's finding concerning the GFA lease. According to Glendale, the expert's reliance on the GAAP definition of the term "capital costs" rendered his entire opinion on the PEG fees issue irrelevant.[14] Glendale asserts that the FCC definition of "capital costs"—those that are "incurred in or associated with the

---

[14] We note that Glendale did not object to the forensic accounting expert's testimony on relevance grounds, choosing instead to argue that the FCC definition should be applied. (FCC Report, *ante,* 22 F.C.C. at p. 5150.) Thus, the trial court did not err in considering the expert's testimony and deciding, based on Glendale's argument, the appropriate amount of weight to accord it. That latter determination of the weight to accord the expert's testimony was a factual matter within the exclusive province of the trial court.

36

construction of PEG access facilities" (FCC report, *supra,* 22 FCC, at p. 5150)—is broader than GAAP and that the lease payments fall within that definition.[15]

Although the trial court relied on Charter's accounting expert when making its factual findings about the GFA lease, its statement of decision makes clear that it applied the FCC definition in concluding that the GFA lease was a sham arrangement intended to allow Glendale to circumvent the Federal Cable Act's five percent limitation on PEG fees and to continue to collect and use PEG fees for operating costs. The trial court gave the term "capital costs" a broad reading in concluding that such costs include "those costs that are incurred in, or that pertain, concern, or bear a relation to, PEG channel capacity, facilities or equipment, or the construction thereof." The trial court determined that Glendale did not reimburse itself for prior capital expenditures because the amount it claimed it was owed was not what it spent on the GTV-6 studio improvements, and the GFA lease was not a real transaction and could not convert operating expenses into PEG fees capital expenditures. In addition, the only Glendale witness to testify about the capital costs issue, Glendale's chief financial officer, Mr. Elliot, conceded that he would apply the same criteria as Charter's expert in determining whether an expenditure was an operating cost or a capital cost. Mr. Elliot did not testify that the PEG fees Glendale collected from Charter were being spent on capital costs. Glendale did not introduce any expert testimony contradicting Charter's expert. Therefore, the trial court did not err in considering the testimony of Charter's expert on the capital costs issue.

The other problem with Glendale's contention concerning the forensic accounting expert's testimony is that it is actually an argument that the trial court's findings concerning the GFA lease are not supported by substantial evidence because they were exclusively based on irrelevant expert opinion. As discussed above, Glendale's failure to challenge the sufficiency of the evidence precludes it from making this argument. Accordingly, the trial court did not err in determining that Glendale had not applied PEG fees exclusively to PEG capital costs or treated them as franchise fees, reducing its

---

[15]     Glendale's definition of capital costs is even broader than that used by the FCC.

franchise fee entitlement accordingly.  Thus, we conclude that the trial court did not err in its conclusion that PEG fees that Glendale charged were not proper.

## DISPOSITION

The judgment is affirmed.  No costs are awarded on either the appeal or cross-appeal.

**CERTIFIED FOR PUBLICATION**

MOSK, Acting P. J.

We concur:

KRIEGLER, J.

GOODMAN, J.[*]

---

[*]     Judge of the Superior Court of Los Angeles County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.