**COMCAST OF SACRAMENTO. I, LLC; Comcast of Sacramento II, LLC; and Comcast of Sacramento III, LLC, Plaintiffs,**

v.

**SACRAMENTO METROPOLITAN CABLE TELEVISION COMMISSION and Does 1 through 20, Defendant.**

**CIV. NO. 2:16–cv–1264 WBS EFB**

United States District Court, E.D. California.

Signed 04/05/2017

Scott M. McLeod, Jill B. Rowe, Cooper, White and Cooper LLP, San Francisco, CA, for Plaintiffs.

Harriet Ann Steiner, Best Best & Krieger LLP, Sacramento, CA, for Defendant.

### MEMORANDUM AND ORDER RE: MOTION AND CROSS–MOTION FOR SUMMARY JUDGMENT

WILLIAM B. SHUBB, UNITED STATES DISTRICT JUDGE

Plaintiffs Comcast of Sacramento I, Comcast of Sacramento II, and Comcast of Sacramento III brought this action against defendant the Sacramento Metropolitan Cable Television Commission, seeking return of a security deposit provided by plaintiffs' predecessor-in-interest to defendant some thirty-three years ago. (Compl. (Docket No. 1).) Plaintiffs now move for summary judgment against defendant, and defendant cross-moves for summary judgment against plaintiffs. (Pls.' Mot. (Docket No. 21); Def.'s Cross–Mot. (Docket No. 22).)

I. Factual and Procedural Background[1]

Plaintiffs are mutually affiliated limited liability companies which provide cable

---

1. The facts discussed in this Order are not disputed.

television service in Sacramento County. (See Docket No. 18; Decl. of Lee–Ann Peling ("Peling Decl.") ¶ 2 (Docket No..21–2); Def.'s Mot., Mem. ("Def.'s Mem.") at 1 n.3, 12 (Docket No. 22–1).) Defendant is a municipal authority which "administer[s] and enforce[es] cable television franchises and licenses" in Sacramento County. (Decl. of Robert Davison ¶ 2 (Docket No. 22–3).)

In 1984, plaintiffs' predecessor-in-interest ("predecessor") provided a $250,000 deposit to defendant as security for its performance of various obligations the county imposed upon it as a cable franchisee. (See Decl. of Jill Rowe ("Rowe Decl.") ¶ 3 (Docket No. 21–3); Def.'s Req. for Judicial Notice Ex. A, Sacramento Cnty. Code § 5.50.702 (Docket No. 22–4).[2]) In 1992, defendant refunded all but $100,000 of the deposit to the predecessor after it had satisfied some of those obligations. (Rowe Decl. ¶ 4.) Pursuant to Sacramento County Code section 5.50.702, defendant was to hold the remaining $100,000 ("security deposit") in an interest-bearing account until "termination of the [predecessor's] franchise and satisfaction of any damages ... which may be due" to defendant, at which time the security deposit and its accrued interest would be returned to the predecessor. (Sacramento Cnty. Code § 5.50.702.)

After 1992, plaintiffs became successors-in-interest to the predecessor's franchise and the security deposit. (See Rowe Decl. ¶ 4.)

In 2006, California passed the Digital Infrastructure and Video Competition Act ("DIVCA"), which divested municipal authorities of all "franchise-granting authority" for "video service[s]" and vested such authority in the California Public Utilities Commission ("CPUC"). Cal. Pub. Util.

Code § 5840(a); Cty. of Los Angeles v. Time Warner NY Cable LLC, No. CV-12-06655 SJO (JCx), 2013 WL 12126774, at *2 (C.D. Cal. July 3, 2013). Pursuant to DIVCA, plaintiffs switched to a CPUC-issued franchise in 2011. (Davison Decl. ¶ 5.) At that time, the defendant-issued franchise plaintiffs had been operating under terminated by operation of law. (Steiner Decl. ¶ 6.)

Following the termination of plaintiffs' franchise with defendant, plaintiffs and defendant became embroiled in a dispute over the amount of fees plaintiffs are required to pay defendant under DIVCA. (See Davison Decl. ¶ 8.) Under DIVCA, plaintiffs are required to pay: (1) an annually determined administrative fee to CPUC ("CPUC fee"), Cal. Pub. Util. Code § 441; (2) a state franchise fee of five percent of gross revenues to defendant ("state franchise fee"), id. § 5840(q)(1); and (3) a public, educational, and government programming fee of one percent of gross revenues to defendant ("PEG fee"), id. § 5870(n). The parties disagree about whether plaintiffs are entitled to deduct their CPUC fee payments from their state franchise fee payments under federal law, and whether payments they collect from their subscribers to pay PEG fees must be included in their gross revenues for purposes of calculating their state franchise fees.

On November 10, 2014, plaintiffs sent a letter to defendant demanding return of the security deposit. (Steiner Decl. Ex. 1 at 33–36, Security Deposit Demand.) Contending that plaintiffs underpaid state franchise fees for the 2011 and 2012 calendar years by $334,610, defendant rejected plaintiffs' demand and notified them that it

2. The court hereby takes judicial notice of the provisions of Sacramento County Code provided with defendant's Cross–Motion (Docket No. 22–4 Ex. A) and plaintiffs' Reply (Docket No. 25–1 Exs. 1–4). See Tollis, Inc. v. Cty. of San Diego, 505 F.3d 935, 938 n.1 (9th Cir. 2007) ("Municipal ordinances are proper subjects for judicial notice.").

would be keeping the security deposit as a partial set-off against the amount allegedly owed. (Davison Decl. ¶¶ 6, 8.) In March 2015, defendant transferred the security deposit from the interest-bearing account it had been held in to defendant's general account. (See Peling Decl. ¶ 4.) The security deposit, with interest, totaled $227,639.45 at the time of transfer. (Rowe Decl. ¶ 5.)

On June 8, 2016, plaintiffs filed this action. (Compl.) Plaintiffs allege causes of action for conversion and "common count" against defendant, seeking payment of the security deposit, interest the deposit accrued up to the date it was transferred to defendant's general account, and prejudgment interest calculated at seven percent per annum the deposit accrued from the date it was transferred to the date judgment is entered in this case. (Id. at 4; Pls.' Mot., Mem. ("Pls.' Mem.") at 11 (Docket No. 21–1).) According to plaintiffs, the total amount sought as of April 3, 2017 is $260,818.16. (See Pls.' Mem. at 11.)

Plaintiffs now move for summary judgment against defendant. (Pls.' Mot.) Defendant cross-moves for summary judgment against plaintiffs. (Def.'s Cross–Mot.) Defendant bases its Cross–Motion on three affirmative defenses: (1) immunity under California Government Code section 815, (2) expiration of the applicable statute of limitations, and (3) right to set off plaintiffs' security deposit and its accrued interest against state franchise fees allegedly owed by plaintiffs for the 2011 and 2012 calendar years. (See Def.'s Mem. at 4–5, 12.)

## II. Legal Standard

■ Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that could affect the outcome of the suit, and a genuine issue is one that could permit a reasonable jury to enter a verdict in the non-moving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "[W]here the operative facts are substantially undisputed, and the heart of the controversy is the legal effect of such facts, such a dispute effectively becomes a question of law that can, quite properly, be decided on summary judgment." Joyce v. Renaissance Design Inc., No. CV 99-07995 LGB (EX), 2000 WL 34335721, at *2 (C.D. Cal. May 3, 2000); see also Braxton–Secret v. A.H. Robins Co., 769 F.2d 528, 531 (9th Cir. 1985) ("[W]here the palpable facts are substantially undisputed, [the controverted] issues can become questions of law which may be properly decided by summary judgment.").

## III. Discussion

Defendant focuses exclusively on affirmative defenses in its Cross–Motion. It does not dispute that absent the issues raised in its affirmative defenses, plaintiffs are entitled to the security deposit and its accrued interest under their conversion and "common count" causes of action.

■ To succeed on a conversion claim under California law, plaintiffs must establish: "(1) [their] ownership or right to possession of the [disputed] property; (2) the defendant's conversion by a wrongful act or disposition of property rights; and (3) damages." Mendoza v. Rast Produce Co., 140 Cal.App.4th 1395, 1405, 45 Cal. Rptr.3d 525 (5th Dist. 2006) (quoting Burlesci v. Petersen, 68 Cal.App.4th 1062, 1066, 80 Cal.Rptr.2d 704 (1st Dist. 1998)). Here, it is undisputed that plaintiffs' predecessor provided a $250,000 deposit to defendant and that plaintiffs are successors-in-interest to the remaining portion of that deposit and its accrued interest. (See Rowe Decl. ¶ 3; Davison Decl. ¶ 4.) It is

also undisputed that after plaintiffs' franchise with defendant terminated, at which time the security deposit became due to plaintiffs, (see Sacramento Cnty. Code § 5.50.702), defendant transferred the security deposit to its general account, causing monetary loss to plaintiffs. (See Peling Decl. ¶ 4; Davison Decl. ¶ 9.) Thus, plaintiffs have established a facially valid conversion claim in this action.

■ Plaintiffs state a second cause of action for "common count." "A common count is not a specific cause of action, however; rather, it is a simplified form of pleading normally used to aver the existence of various forms of monetary indebtedness...." McBride v. Boughton, 123 Cal.App.4th 379, 394, 20 Cal.Rptr.3d 115, (1st Dist. 2004) (citing Zumbrun v. Univ. of S. California, 25 Cal.App.3d 1, 14–15, 101 Cal.Rptr. 499 (2d Dist. 1972)). "When a common count is used as an alternative way of seeking the same recovery demanded in a specific cause of action, and is based on the same facts," it "must stand or fall with [the specific] cause of action." Id. (citing Zumbrun, 25 Cal.App.3d at 14, 101 Cal.Rptr. 499 and Farmers Ins. Exch. v. Zerin, 53 Cal.App.4th 445, 459–60, 61 Cal. Rptr.2d 707 (3d Dist. 1997)). Because plaintiffs' "common count" claim appears to seek the same relief and be based on the same facts as their conversion claim, the court will decide their "common count" claim together with their conversion claim.

Having addressed the facial validity of plaintiffs' claims, the court next addresses whether plaintiffs' claims survive defendant's affirmative defenses.

### A. Immunity Under California Government Code Section 815

Defendant contends that plaintiffs' claims are barred under California Government Code section 815 ("section 815") because they are not statutory causes of action. (Def.'s Mem. at 4.) Section 815 states that "[e]xcept provided by statute ... [a] public entity is not liable for an injury, whether such injury arises out of an act or omission of the public entity or a public employee or any other person." Cal. Gov't Code § 815(a).

■ Plaintiff correctly notes, however, that section 815's bar on non-statutory claims does not apply to claims based on contract. See Cal. Gov't Code § 814 (noting that section 815 does not "affect[ ] liability based on contract"). "Whether an action is based on contract or tort depends upon the nature of the right sued upon, not the form of the pleading or relief demanded." Util. Audit Co. v. City of Los Angeles, 112 Cal.App.4th 950, 958, 5 Cal.Rptr.3d 520 (2d Dist. 2003). An action "based on breach of promise ... is contractual." Id. An action "based on breach of a noncontractual duty ... is tortious." Id. "If unclear the action will be considered based on contract rather than tort." Id. (citing Roe v. State of California, 94 Cal.App.4th 64, 113, 113 Cal.Rptr.2d 900 (1st Dist. 2001)).

■ Though plaintiffs' sole operative cause of action is a tort, see Moore v. Regents of Univ. of California, 51 Cal.3d 120, 136, 271 Cal.Rptr. 146, 793 P.2d 479 (1990) (referring to conversion as a "tort"), the right sued upon in this case is contractual. The provision giving rise to plaintiffs' claim for return of the security deposit is Sacramento County Code section 5.50.702 ("section 5.50.702"), which acts as a promise on defendant's part to return the deposit to plaintiffs "[u]pon termination of the [their] franchise and satisfaction of any damages ... which may be due" to defendant. (Sacramento Cnty. Code § 5.50.702.) Sacramento County Code section 5.50.018 expressly refers to section 5.50.702 as a "provision[ ] of ... contract." (See Docket No. 25–1 Ex. 1, Sacramento Cnty. Code § 5.50.018 ("All ... provisions of [fran-

chise] contract[s] shall be deemed to be embodied in the Franchise Documents....."); Sacramento Cnty. Code § 5.50.012j (defining "Franchise Documents" to include Sacramento County Code section 5.50.702).) Thus, this action is based on contract, and not subject to section 815's bar on non-statutory actions.

## B. Statute of Limitations

■ Defendant next contends that plaintiffs' claims are barred under California Code of Civil Procedure section 338 ("section 338"), (see Def.'s Mem. at 12), which imposes a three-year limitations period on conversion claims, see Cal. Civ. Proc. Code § 338(c)(1) (subjecting "action[s] for taking, detaining, or injuring goods or chattels" to three-year limitations period); AmerUS Life Ins. Co. v. Bank of Am., N.A., 143 Cal.App.4th 631, 639, 49 Cal.Rptr.3d 493 (2d Dist. 2006) ("[California] Code of Civil Procedure, section 338, subdivision (c) ... applies to the conversion of personal property....."). According to defendant, section 338's limitations period began to run in this case when plaintiffs' franchise with defendant terminated in 2011, at which time the security deposit became due to plaintiffs. (See Def.'s Mem. at 12.) Because plaintiffs did not file this action until June 2016, defendant contends, this action is barred under section 338. (Id.)

■ Plaintiffs correctly note that under California law, however, the limitations period on a conversion claim that arises from an originally lawful taking "does not begin to run until the return of the property has been demanded and refused or until a repudiation of the owner's title is unequivocally brought to her or his attention." Ramirez v. Tulare Cnty. District Attorney's Office, 9 Cal.App.5th 911, 215 Cal. Rptr.3d 512, 532 (5th Dist. 2017) (quoting Coy v. Cnty. of Los Angeles, 235 Cal. App.3d 1077, 1088, 1 Cal.Rptr.2d 215 (2d

Dist. 1991)). Here, it is undisputed that defendant's receipt of $250,000 from plaintiffs' predecessor was originally lawful. (See Pls.' Mem. at 5; Def.'s Mem. at 12.) Thus, section 338's limitations period did not begin to run in this case until plaintiffs demanded and were refused the security deposit or had unequivocal notice that defendant repudiated their ownership of the security deposit.

The evidence before the court indicates that plaintiffs' action is timely under both limitations triggering tests. According to an affidavit submitted by plaintiffs, plaintiffs did not demand the security deposit until November 10, 2014, and defendant did not repudiate their ownership of the security deposit until March 2015, when it informed plaintiffs that it would be transferring the security deposit to its general account. (See Peling Decl. ¶¶ 4–5.) Defendant has not cited any evidence indicating that a demand or repudiation took place prior to November 2014. Because plaintiffs filed this action on June 8, 2016, the evidence before the court indicates that this action is timely under section 338.

Defendant requests, as an alternative to judgment under section 338, that the court continue disposition of its section 338 defense to allow it to conduct discovery regarding that defense. (Def.'s Mem. at 13.) The Ninth Circuit has held that a party requesting continuance of a summary judgment motion to conduct discovery "must identify by affidavit the specific facts that [the] discovery would reveal" and "explain why [such] information ... [is] essential to [that party's] opposition" to the other party's motion. Tatum v. City & Cnty. of San Francisco, 441 F.3d 1090, 1100 (9th Cir. 2006) (citing Fed. R. Civ. P. 56(d)); see also State of Cal. v. Campbell, 138 F.3d 772, 779 (9th Cir. 1998) (same). Here, defendant represents that discovery would reveal "whether [plaintiffs] made any demand for return of [their] security

deposit prior to November 2014," which, according to defendant, is essential to any opposition it might raise to plaintiffs' position that this action is timely under the limitations triggering tests they have cited. (See Steiner Decl. ¶ 7.)

Putting aside the fact that there is already evidence indicating that plaintiffs did not demand return of the security deposit prior to November 2014, (see Peling Decl. ¶ 5), defendant fails to explain why the information it seeks is essential to showing that this action is untimely. The limitations triggering test at issue in defendant's discovery request is demand of the property in question and refusal of such demand. See Ramirez, 215 Cal. Rptr.3d at 532–33. Because defendant can only refuse plaintiffs' demand after they have made a demand, the date of refusal is dispositive of whether plaintiffs demanded and defendant refused to return the security deposit prior to June 8, 2013.[3] Thus, the date on which plaintiffs first demanded return of their security deposit is not essential to that inquiry. Because the date of plaintiffs' first demand is not essential to defendant's statute of limitations defense, the court will deny defendant's request for continuance.

## C. Right to Set–Off

Defendant focuses most of its Cross–Motion brief on its set-off defense. That defense, as indicated in the fact section of this Order, posits that defendant has a right to set off plaintiffs' security deposit and its accrued interest against $334,610 in state franchise fees that plaintiffs allegedly underpaid for the 2011 and 2012 calendar years.

■ California Code of Civil Procedure section 431.70 states that "[w]here cross-demands for money have existed between persons at any point in time when neither demand was barred by the statute of limitations, and an action is thereafter commenced by one such person, the other person may assert in the answer the defense of payment in that the two demands are compensated so far as they equal each other...." Cal. Civ. Proc. Code § 431.70. This procedure, often referred to as a "set-off," is intended to "eliminate[ ] a superfluous exchange of money between the parties." Jess v. Herrmann, 26 Cal.3d 131, 137, 161 Cal.Rptr. 87, 604 P.2d 208 (1979).

■ "[A] defendant may ... assert [a] setoff defensively to defeat the plaintiff's claim in whole or in part," though it "may not [use the setoff to] obtain an award of affirmative relief against [the] plaintiff." Constr. Protective Servs., Inc. v. TIG Specialty Ins. Co., 29 Cal.4th 189, 198, 126 Cal.Rptr.2d 908, 57 P.3d 372, (2002). In determining whether to grant a set-off, the court may adjudicate the merits of yet-to-be-adjudicated set-off claims. See, e.g., Unicom Sys., Inc. v. Farmers Grp., Inc., 405 Fed.Appx. 152, 154 (9th Cir. 2010) (affirming lower court's adjudication of merits of set-off claim).

Defendant asserts, and plaintiffs do not dispute, that timely cross-demands for the security deposit and state franchise fees in question existed concurrently after the state franchise fees for the 2011 and 2012 calendar years became due. (See Def.'s Mem. at 5.) Plaintiffs also do not dispute that they did not pay the state franchise fees in question. (See Peling Decl. ¶¶ 7–8.) They dispute only whether defendant may charge them such fees.

The state franchise fees in question consist of fees that plaintiffs allegedly under-

---

**3.** If defendant refused a demand prior to June 8, 2013, this action is untimely. If defendant did not refuse a demand prior to June 8, 2013, this action is timely (assuming defen-dant also did not unequivocally repudiate plaintiffs' ownership of the security deposit prior to that date).

paid for the 2011 and 2012 calendar years because they: (1) unilaterally deducted their CPUC fees from their state franchise fees, and (2) failed to include payments they collected from subscribers to pay PEG fees in their gross revenues in calculating their state franchise fees.

### 1. Deduction of CPUC Fees

■ The parties' dispute with respect to plaintiffs' deduction of CPUC fees centers over the interpretation of 47 U.S.C. § 542 ("section 542"), subdivision (b) of which states that "[f]or any twelve-month period, the franchise fees paid by a cable operator with respect to any cable system shall not exceed 5 percent of such cable operator's gross revenues derived in such period from the operation of the cable system to provide cable services." 47 U.S.C. § 542(b). Defendant argues that the CPUC fee is not a "franchise fee" within the meaning of section 542(b), and thus does not count toward the five percent cap it imposes. (Def.'s Mem. at 7.) Plaintiffs argue that the CPUC fee is a "franchise fee" within the meaning of section 542(b), and thus counts toward its five percent cap. (Pls.' Mem. at 7.) Because the CPUC fee counts toward section 542(b)'s five percent cap, according to plaintiffs, the five percent state franchise fee they are obligated to pay defendant under DIVCA must be reduced by the CPUC fee, pursuant to the principle of federal preemption.

Section 542(g)(1) defines "franchise fee" to include "any tax, fee, or assessment of any kind imposed by a franchising authority or other governmental entity on a cable operator ... solely because of [its] status as such." 47 U.S.C. § 542(g)(1). Section 542(g)(2) expressly excludes from its definition of "franchise fee" "any tax, fee, or assessment of general applicability (including any such tax, fee, or assessment imposed on both utilities and cable operators

or their services but not including a tax, fee, or assessment which is unduly discriminatory against cable operators)." Id. § 542(g)(2)(A).

The CPUC fee, codified in California Public Utilities Code section 441 ("section 441"), applies not only to cable operators, but to all "holders of a state franchise" that authorizes the "operation of any network in the right-of-way capable of providing video service to subscribers" ("video franchise holders"). Cal. Pub. Util. Code §§ 441, 5830(f), (h); see also Time Warner, 2013 WL 12126774, at *5 (noting that "it is possible to qualify for [the CPUC] fee without being a cable operator"). "[N]oncable operat[ing] video [franchise holders such] as Netflix, RedBox, and Blockbuster" may be subject to the CPUC fee. Time Warner, 2013 WL 12126774, at *5.

In view of the applicability of the CPUC fee to non-cable operating video franchise holders, it would not be proper to conclude that the fee is imposed on cable operators "solely because of their status as such." The CPUC fee is imposed on cable operators because of their status as video franchise holders, a status that is different from the status of being cable operators. If a given cable company were to stop operating cable, it would still be subject to the CPUC fee so long as it holds a video franchise.

The applicability of the CPUC fee to non-cable operators also supports finding that it is a "fee ... of general applicability" under section 542(g)(2). As noted above, all entities that hold a video franchise, not merely cable operators, are subject to the CPUC fee. The CPUC fee is not unduly discriminatory towards cable operators because it does not apply only to them. Thus, the court finds that the CPUC fee is a fee "of general applicability" under section 542(g)(2).[4]

---

4. At oral argument, plaintiffs argued at length    that the CPUC fee does not apply to utilities

Because the CPUC fee is not imposed on cable companies "solely because of their status as such," and because it is a "fee ... of general applicability," the CPUC fee is not a "franchise fee" within the meaning of section 542.

The court's position on this issue accords with the position of at least two other courts, which have also held fees that are imposed on non-cable operating entities to be excluded from the definition of "franchise fees" under section 542. See Zayo Grp., LLC v. Mayor & City Council of Baltimore, No. JFM-16-592, 2016 WL 3448261 (D. Md. June 14, 2016) (holding that conduit use fee that applies to "all users of the City's conduit system," not merely cable companies, is not "franchise fee" within the meaning of section 542); City of Eugene v. Comcast of Oregon II, Inc., 359 Or. 528, 558, 375 P.3d 446 (2016) (holding that license fee that applies to all companies that "provide[ ] telecommunications services over ... public rights of way," not merely cable companies, is not "franchise fee" within the meaning of section 542).

Plaintiffs cite Time Warner, 2013 WL 12126774, for the contrary position. In Time Warner, the court noted that though the CPUC fee applies to non-cable operators, section 542 "does not require that a franchise fee be a fee assessed solely against cable operators; [instead,] it requires that cable operators' status as cable operators be the sole reason for assessment of a franchise fee." Id. at *5. Noting that the defendant cable company used its

video franchise only to operate cable service, the Time Warner court reasoned that if the company did not operate cable service, it would not be a video franchisee, and thus not be subject to the CPUC fee. See id. Based on that reasoning, the Time Warner court concluded that the company's status as a cable operator was the sole reason it was subject to the CPUC fee. Id.

This court disagrees with Time Warner's analysis. Assuming Time Warner's paraphrase of section 542 to be correct, it still would not be the case that a cable company's status as a cable operator is the sole reason it is subject to the CPUC fee. As explained above, a cable company is subject to the CPUC fee for the separate reason that it is a video franchise holder. That a cable company uses its video franchise only to provide cable service does not change the fact that it is a video franchise holder, and thus subject to the CPUC fee for that reason. It requires a leap of logic to conclude, as Time Warner did, that entities that use their video franchise only to provide cable service would not be video franchisees if they did not provide cable service. Thus, in this court's view, Time Warner's conclusion does not follow from its premises. Because Time Warner is an unpublished district court decision, this court is not bound to follow it. See People of Territory of Guam v. Yang, 800 F.2d 945, 949 (9th Cir. 1986) ("The law is clear that an unpublished district court decision has no precedential authority.").

because CPUC charges a separate fee to "electrical, gas, telephone, telegraph, water, sewer system, and heat corporation[s] and every other public utility." (See also Pls.' Reply at 9–10 (citing Cal. Pub. Util. Code § 431) (Docket No. 25).) That a given entity is subject to CPUC's utility fee, however, does not mean that it may not also be subject to CPUC's video franchise fee. Section 441, by its terms, imposes its fee on all holders of a video fran-

chise; it makes no exceptions for entities subject to other fees imposed by CPUC. Moreover, even if the court were to find that the CPUC fee does not apply to utilities, that would not preclude the CPUC fee from being a fee of general applicability under section 542(g)(2). See 47 U.S.C. § 542 (merely stating that fees of general applicability "includ[e] ... fee[s] ... imposed on both utilities and cable operators").

For the reasons stated above, the court finds that the CPUC fee is not a "franchise fee" within the meaning of section 542. Because the CPUC fee is not a "franchise fee" within the meaning of section 542, plaintiffs were not entitled under section 542 to deduct CPUC fees from their state franchise fees for the 2011 and 2012 calendar years.

### 2. Failure to Include PEG Payments in Gross Revenues

■ The parties also dispute whether plaintiffs must include payments they collect from subscribers to pay PEG fees in their gross revenues for purposes of calculating their state franchise fees. Their dispute centers over the interpretation of California Public Utilities Code section 5860 ("section 5860").

Section 5860(d) defines "gross revenue" for purposes of state franchise fees as:

> [A]ll revenue actually received by the holder of a state franchise, as determined in accordance with generally accepted accounting principles, that is derived from the operation of the holder's network to provide cable or video service within the jurisdiction of the local entity, including ... [a]ll charges billed to subscribers for any and all cable service or video service provided by the holder of a state franchise, including all revenue related to programming provided to the subscriber, equipment rentals, late fees, and insufficient fund fees.

Cal. Pub. Util. Code § 5860(d).

Section 5860(e), however, states that "the term 'gross revenue' set forth in [section 5860(d) ] does not include ... [a]mounts billed to, and collected from, subscribers to recover any tax, fee, or surcharge imposed by any governmental entity on the holder of a state franchise, including, but not limited to, sales and use taxes, gross receipts taxes, excise taxes, utility users taxes, public service taxes, communication taxes, and any other fee not imposed by this section." Id. § 5860(e).

Plaintiffs argue that payments they collect from subscribers to pay PEG fees fit squarely within the exception stated in section 5860(e), and thus are not part of "gross revenues" as defined in section 5860(d).

Plaintiffs' position appears to be correct. PEG fees, which are allowed under California Public Utilities code section 5870 ("section 5870") and established pursuant to Sacramento County Code, are charged by defendant to plaintiffs. (Peling Decl. ¶ 8.) Plaintiffs, in turn, pass the fee on to their subscribers, (id.), who pay the fee "as a separate line item on [their] regular bill," Cal. Pub. Util. Code § 5870(o). Plaintiffs then forward the PEG payments made by their subscribers to defendant. (Peling Decl. ¶ 8.) This procedure is expressly authorized and described in section 5870(o). Cal. Pub. Util. Code § 5870(o). Because the payments plaintiffs collect from their subscribers to pay PEG fees are "amounts billed to, and collected from, subscribers to recover ... [a] fee ... imposed by [a] governmental entity," they are not part of "gross revenue[s]" as defined in section 5860(d).

Defendant contends that section 5860(e)'s exception applies only to payments collected from subscribers to recover "fee[s] not imposed by [section 5860]," and that PEG fees are imposed pursuant to section 5860(c). (Def.'s Mem. at 9–10.) Because PEG fees are imposed pursuant to section 5860, defendant concludes, payments collected to recover them are "gross revenues."

Both premises supporting this argument are flawed. Section 5860(e) does not limit its exception to "fee[s] not imposed by [section 5860]." It expressly states that its exception "includ[es], but [is] not limited to ... fee[s] not imposed by [section 5860]."

Cal. Pub. Util. Code § 5860(e). Moreover, there is no indication that section 5860 imposes PEG fees. Section 5860(c), which defendant cites for that assertion, merely authorizes "local entit[ies] to impose utility user taxes and other generally applicable taxes, fees, and charges under other applicable provisions of state law." Id. § 5860(c). Nowhere does it impose PEG fees. Thus, defendant's argument is without merit.

Defendant also argues that plaintiffs were not permitted, as a procedural matter, to unilaterally deduct PEG payments collected from subscribers from their gross revenues in calculating state franchise fees. City of Glendale v. Marcus Cable Assocs., LLC, 231 Cal.App.4th 1359, 180 Cal.Rptr.3d 726 (2d Dist. 2014), according to defendant, stands for the proposition that a cable company may not unilaterally withhold disputed state franchise fees from municipal authorities. (Def.'s Mem. at 10–11.) Instead, the company must pay the fees to the authority, then challenge whether the fees were proper in court. (Id.) Because plaintiffs unilaterally deduct-

ed PEG payments from their gross revenues in calculating state franchise fees for the 2011 and 2012 calendar years, defendant contends, defendant is entitled to the state franchise fees plaintiffs would otherwise have paid for those cycles under City of Glendale.

This argument is without merit as well. City of Glendale was a case that affirmed a lower court's denial of a cable company's request for a declaration stating that it may withhold future PEG fee payments in order to offset past PEG fee overpayments. See City of Glendale, 231 Cal. App.4th at 1378, 180 Cal.Rptr.3d 726. City of Glendale was decided based on the court's conclusion that such a declaration would, in effect, circumvent 47 U.S.C. § 555a's prohibition on award of damages against governmental entities in cable regulation suits. See id. The case did not decide the legality of unilaterally withholding disputed state franchise fees. Thus, City of Glendale does not stand for the proposition defendant cites it for.[5]

---

**5.** City of Glendale raises the question of whether this action is barred under 47 U.S.C. § 555a ("section 555a"). Section 555a states that "[i]n any court proceeding ... involving any claim against a ... governmental entity ... arising from the regulation of cable service ... any relief ... shall be limited to injunctive relief and declaratory relief." 47 U.S.C. § 555a. Here, plaintiffs are seeking return of a security deposit plus interest. But defendant has already transferred that money to its general account. (Peling Decl. ¶ 4.) Thus, an argument can be made that this is a suit for damages. See Edelman v. Jordan, 415 U.S. 651, 677, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974) (holding that "prospective injunctive relief ... may not include a retroactive award which requires the payment of funds from the state treasury").

It is doubtful, however, that this action "aris[es] from the regulation of cable service" under section 555a. The parties' dispute is about defendant's failure to return a security deposit. The court is not aware of a case that

has held or suggested that an action brought by a cable company to recover a security deposit from a cable-regulating entity is one that "aris[es] from the regulation of cable service" under section 555a. Cases that have applied section 555a appear to indicate that section 555a was meant to bar claims arising directly out of cable regulation, as opposed to claims that are only tangentially related to cable regulation. Cf., e.g., Coplin v. Fairfield Pub. Access Television Comm., 111 F.3d 1395, 1408 (8th Cir. 1997) (applying section 555a to action brought by talk show producer challenging city's decision to ban him from public access cable channel based on content of his show); Jones Intercable of San Diego, Inc. v. City of Chula Vista, 80 F.3d 320, 324 (9th Cir. 1996) (applying section 555a to action brought by cable operator challenging city's requirement that it obtain a permit before providing cable services). Accordingly, the court will not deny plaintiffs' claims based on section 555a.

Because the payments plaintiffs collect from subscribers to pay PEG fees are not part of "gross revenue[s]" under section 5860, plaintiffs were entitled to withhold them from their gross revenues when calculating state franchise fees for the 2011 and 2012 calendar years.

For the reasons stated in this Order, the court finds that plaintiffs have established a valid conversion claim for recovery of their security deposit plus its accrued interest, and defendant has established a right to set off that amount by the amount of CPUC fees plaintiffs deducted from their 2011 and 2012 state franchise fees. Accordingly, plaintiffs are entitled to the security deposit, interest the deposit accrued prior to the date it was transferred to defendant's account, and prejudgment interest calculated at seven percent per annum [6] the deposit accrued from the date it was transferred to the date judgment is entered in this case, less the CPUC fees plaintiffs deducted from their state franchise fees for the 2011 and 2012 calendar years. Because the parties have not offered the court a calculation of what this sum is, the court will permit the parties to do so before entering judgment on this Order.

IT IS THEREFORE ORDERED that plaintiffs' Motion for summary judgment be, and the same hereby is, GRANTED IN PART and DENIED IN PART, and that defendant's Cross–Motion for summary judgment be, and the same hereby is, GRANTED IN PART and DENIED IN PART, as follows:

(1) Plaintiffs are entitled to payment of the $100,000 security deposit discussed in this Order, interest the deposit accrued prior to the date it was transferred to defendant's gen-

eral account, and prejudgment interest calculated at seven percent per annum the deposit accrued from the date it was transferred to the date judgment is entered in this case, less the fees imposed pursuant to California Public Utilities Code section 441 that plaintiffs deducted from their state franchise fees for the 2011 and 2012 calendar years.

(2) Plaintiffs' Motion and defendant's Cross–Motion are DENIED in all other respects.

IT IS FURTHER ORDERED that within fourteen days of the date this Order is signed, the parties shall submit a form of Judgment consistent with this Order, setting forth the amount of payment, if any, plaintiffs are entitled to under this Order.

---

6. "The legal rate of interest on an obligation before the entry of judgment is 7 percent, unless otherwise specified by statute." Uzyel v. Kadisha, 188 Cal.App.4th 866, 921, 116 Cal.Rptr.3d 244 (2d Dist. 2010). The parties have not cited, and the court is not aware of, a statute that requires a different interest rate in this action.