Filed 3/30/20; Opinion on transfer from Supreme Court

**CERTIFIED FOR PARTIAL PUBLICATION\***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B262278 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. SA078033) |
| v. | |
| MICHAEL MARISCAL, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Antonio Barreto, Jr., Judge. Affirmed in part, reversed in part and remanded with direction.

Paul Couenhoven, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Paul M. Roadarmel, Jr. and William N. Frank, Deputy Attorneys General, for Plaintiff and Respondent.

_____

\*      Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of parts B through G of the Discussion.

Defendant and appellant Michael Mariscal shot at five men, killing two and wounding another, in a gang-motivated shooting. He was convicted of two counts of murder (Pen. Code, § 187, subd. (a)), three counts of attempted murder (§§ 664 and 187, subd. (a)), street terrorism (§ 186.22, subd. (a)), and possession of a firearm by a felon (§ 12021, subd. (a)(1)).[1] On initial appeal from his conviction, he argued (1) the trial court erred by instructing the jury that the element of a specific intent to kill required for an attempted murder conviction could be found based on a "kill zone." He also argued (2) there was insufficient evidence to support a finding the driver of the vehicle in which defendant was a passenger was a member of defendant's gang; (3) the court erroneously admitted evidence of the psychological impact of the attempted murder on one of the victims; (4) the court should not have imposed a parole revocation fine; and (5) the court should have awarded presentence custody credits. The prosecution argued (6) the abstract of judgment should be corrected to reflect the court's oral pronouncements of sentence.

In our initial opinion, we affirmed the convictions but reversed the trial court's imposition of a $200 parole revocation fine, and its order denying defendant custody credit. We remanded the matter for the trial court to amend the abstracts of judgment (both determinate and indeterminate) consistent with the opinion, and otherwise affirmed. (*People v. Mariscal* (April 1, 2016, B262278) [nonpub.opn.].)

Defendant sought review. The Supreme Court granted

---

[1]    All statutory citations are to the Penal Code unless otherwise noted.

review, but deferred briefing pending resolution of the "kill zone" issue in its then-pending case, *People v. Canizales* (2019) 7 Cal.5th 591 (*Canizales*). Upon resolution of *Canizales*, the Supreme Court transferred the case back to us, with directions to vacate our decision and reconsider in light of *Canizales*. We do so now, concluding that the kill zone instruction should not have been given, but that the error was harmless beyond a reasonable doubt in light of the overwhelming evidence that defendant intended to kill all five of the men at whom he shot. In all other respects, we restate our original opinion without change.

## BACKGROUND

### A. Factual Background

#### 1. Prosecution Evidence

At about 3:00 p.m. on June 22, 2011, an employee of a property management firm located on Centinela Street, about 1.7 miles from Penmar Park in Venice, saw a Hispanic man with a slight build park a light or silver colored Volvo station wagon in the parking space near where she worked. About one hour later, Allan Mateo, Salvador Diaz, Andy Santiago, Emmanuel Vasquez, and Christian Hernandez were sitting together on bleachers at Penmar Park in Venice. None of the young men were gang members at that time but they knew gang members.

The bleachers consisted of nine rows of benches of increasing elevation, facing a baseball diamond. Four of the young men were sitting on the top row of the bleachers, with Mateo a few rows below them.

The Volvo station wagon pulled up near the park. Defendant exited the Volvo and approached the group holding his hands behind his back. He approached the bleachers from the right-hand side, near the corner where the men were

3

congregated.  Defendant asked the young men where they were "from," effectively asking them the name of their gang.  Mateo replied they were not gang members.  Defendant pulled out a gun, said "Culver City," and shot Mateo multiple times.  Mateo grabbed his stomach and fell; he died of his wounds.  Defendant then pointed the gun toward the four men who had been on the top row of the bleachers.

When defendant turned his gun toward the rest of the young men, they tried to run.  Hernandez ran down the bleachers and toward the baseball field.  As he ran, defendant shot him in both legs.  Santiago tried to run down the bleachers, but he fell through the bleachers to the ground, and ran to hide behind some parked cars.  He was not hit.  Diaz died on the ground below the bleachers, having been shot in the chest.  Vasquez's actions are not clear from the record, but he escaped unharmed.

In sum, defendant shot:  Mateo four times, two of which were fatal; Diaz twice in the chest, one of which was fatal; and Hernandez twice in his legs.  Neither Santiago nor Vasquez were shot.

Nine .9-millimeter shell casings were found near the bleachers at the park.  All of the casings were fired from the same gun.

Maritza Perez, a softball coach, heard the gunshots.  Defendant lowered the gun and ran, crossing a street in front of Perez.  The headlights of the Volvo turned on.[2]  The driver of the car looked over his left shoulder in defendant's direction.  Perez saw the driver was a thin Hispanic man with short hair.

---

[2]      Between about 4:00 p.m. and 4:15 p.m., a construction company employee observed a gray Volvo parked at the Centinela Street location.

Defendant ran to the car, looked around, and entered the car through the passenger door. The car drove away, but Perez was able to write down a portion of the car's license plate number— "W229." Perez called 911.

Citing People's Exhibit 7, defendant acknowledges the license plate of the car defendant entered was LTWY229. The car had been stolen between June 18 and 19, 2011, and defendant's fingerprints were found on its passenger door. Between approximately 4:00 p.m. and 4:15 p.m., telephone calls were made on defendant's cell phone using cellular towers near where the Volvo was found and near the shooting scene.

At 4:26 p.m., on June 22, 2011, the day of the shooting, defendant texted a female friend, "I love you, babe. If I don't reply, I am busted." At 4:30 p.m., a local news website, yovenice.com, posted a story about the shooting, stating three people had been shot. Defendant texted someone, "Two men shot. One in the leg. Fox11la.com. Also on yo venice." He also texted this person, "Watch the news, bro."

At 4:53 p.m., a local television affiliate of the Fox News Network, posted a story about the shooting on its website. Later that day, defendant texted the female friend as follows: "News. Two men shot, One in leg. Fox 11 L.A." His friend texted back: "Did you shoot someone?" Defendant answered: "Don't text like that, babe. Come on now. Just letting you know what is on and what happened."

The following morning, the Volvo remained parked at the parking space for the vacant apartment complex. The driver's door of the car was half closed and keys were in the ignition. Perez identified photographs of the Volvo as the same car defendant entered after he shot the victims.

The police arrested defendant. After defendant arrived at the police station, he was allowed to use his cell phone. Defendant sent someone a text message, summarized by Los Angeles Police Department Detective Terrance Keyzer as follows: "[Defendant] is saying that he is going to act innocent and ask the person he is talking to, to play along because he is scared. Then [defendant] tells [the person] to erase all messages."

Later at the station, defendant told his mother the police would "never find the gun," it was "impossible" for them to find it, and it was "gone."[3] Defendant's mother told defendant the police had taken his cousin's cell phone. In response, defendant asked his mother if his cousin had deleted "the messages," and she responded, "Yeah."

Los Angeles City Police Officer Nicholas Coronado, the prosecutor's gang expert, testified a gang member earns "respect" by "putting in work," i.e., committing crimes. A "roll call" is a list of gang members, usually using their gang monikers/nicknames. The question "Where are you from?" is a threat or a challenge to rival gang members or the public at large that often precedes a confrontation.

Officer Coronado was assigned to the Pacific Police Station's gang enforcement detail and specifically assigned to monitor the Culver City Boys gang. The Culver City Boys gang membership was primarily Hispanic. The gang claimed portions of Culver City and nearby areas of Los Angeles. Venice 13 or "V13" claimed adjacent areas, including Penmar Park. The Culver City Boys had a rivalry with V13, among other local gangs.

---

[3] The gun used in the shooting was never found.

The Culver City Boys primary activities included robberies, burglaries, assaults with deadly weapons, vandalisms, narcotics sales, and auto thefts. The gang members used signs including the letters "CXC" and "CC" to identify itself and communicate status in the gang. In 2009, two Culver City Boys gang members were convicted of separate robberies.

Defendant was an admitted Culver City Boys gang member. He had a tattoo of "CC" on his hand and a moniker of "Little Poste." A Culver City Boys roll call with the name "Little Poste" included on it was found in defendant's apartment.

Officer Coronado opined defendant was a Culver City Boys gang member and, based on a set of hypothetical facts matching the facts in this case, the murders and attempted murders were performed for the benefit of, at the direction of, or in association with the Culver City Boys gang. The expert also opined, because the driver of the Volvo was willing to help defendant conduct the shootings, the driver "[was] either a fellow gang member or [was] at the time an associate putting in work [to] show that he was "represent[ing the] hood [] too."

### 2. Defendant's Evidence

Dr. Mitchell Eisen, defendant's identification expert, testified several variables could affect the accuracy of an eyewitness's identification, including capacity limits on attention; stress and trauma; exposure duration and time passage. According to Dr. Eisen, the manner in which eyewitness evidence is collected may also affect an identification, including how the identification procedure is set up and admonitions given to the witness. He opined a "double-blind" line-up (such that neither the eyewitness nor the officer conducting the line-up knows whether a suspect is included) is the most accurate manner in

7

which to collect eyewitness evidence.

## B.     *Procedural Background*

The Los Angeles County District Attorney filed an amended information charging defendant with the murders of Mateo and Diaz in violation of section 187, subdivision (a) (counts 1 and 2), the willful, deliberate, and premeditated attempted murders of Hernandez, Santiago, and Vasquez in violation of sections 664 and 187, subdivision (a) (counts 3-5); street terrorism in violation of section 186.22, subdivision (a) (count 6); and possession of a firearm by a felon in violation of section 12021, subdivision (a)(1) (count 7).

The District Attorney alleged as to counts 1 and 2: defendant committed multiple murders, a special circumstance pursuant to section 190.2, subdivision (a)(3); and defendant committed the murders while he was an active participant in a criminal street gang and did so to further that gang's activities, a special circumstance pursuant to section 190.2, subdivision (a)(22).  As to counts 1-3, it was alleged during the commission of the two murders (counts 1 and 2) and the attempted murder of Hernandez (count 3), defendant personally and intentionally discharged a firearm, which caused great bodily injury and death (§ 12022.53, subd. (d)).[4]  As to counts 1-5, it was alleged: during the commission of the offenses, defendant personally and intentionally discharged a firearm (§ 12022.53, subds. (b) & (c)); and the offenses were committed by defendant for the benefit of, at the direction of, or in association with a criminal street gang

---

[4]     Because the crime in this case took place in June 2011, all references to section 12022.53 are to the version of that section in effect at that time.  (Stats. 2006, ch. 901, § 11.1.)

8

(§ 186.22, subd. (b)(4)).[5]  As to count 7, it was alleged defendant committed the offense within the meaning of section 186.22, subdivision (b)(1)(A).  Following a trial, the jury found defendant guilty on all counts, determined the murders were in the first degree, and found the alleged special circumstances and enhancements to be true.

The trial court sentenced defendant to state prison for the following indeterminate terms, each to run consecutively to each other:  on count 1, life without the possibility of parole, plus 25 years to life pursuant to section 12022.53, subdivision (d); on count 2, life without the possibility of parole, plus 25 years to life pursuant to section 12022.53, subdivision (d); on count 3, life with the possibility of parole, plus 25 years to life pursuant to section 12022.53, subdivision (d); on count 4, life with the possibility of parole; and on count 5, life with the possibility of parole.  Under section 654, the trial court imposed but stayed sentences on counts 6 and 7, enhancements pursuant to section 12022.53, subdivisions (b) and (c) for counts 1-5, and enhancements pursuant to section 186.22 on counts 1-5, and 7.

The trial court ordered defendant to pay a $200 restitution fine under section 1202.4, subdivision (b), and a $200 parole revocation fine under section 1202.45, to be stayed pending successful completion of parole.  The trial court declined to credit defendant for actual time served as of date of sentencing.  Defendant filed a timely notice of appeal.

---

[5]     All references to section 186.22 are to the version of that section in effect in June 2011.  (Stats. 2010, ch. 256, § 1.)

*DISCUSSION*

### A. *Kill Zone Instruction*

#### 1. The Law

"To prove the crime of attempted murder, the prosecution must establish 'the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.' [Citation.] When a single act is charged as an attempt on the lives of two or more persons, the intent to kill element must be examined independently as to each alleged attempted murder victim; an intent to kill cannot be 'transferred' from one attempted murder victim to another under the transferred intent doctrine. [Citation.] [¶] Direct evidence of intent to kill is rare, and ordinarily the intent to kill must be inferred from the statements and actions of the defendant and the circumstances surrounding the crime. [Citations.]" (*People v. Canizales, supra*, 7 Cal.5th at p. 602.)

California has embraced the concept "of a *concurrent* intent to kill." (*Canizales, supra,* 7 Cal.5th at p. 602.) In some situations, the defendant may intend to ensure harm to the primary victim by harming everyone in the intended victim's vicinity – such as by an explosive device or a hail of bullets. In such a case, the factfinder can infer that, whether or not the defendant was successful in killing the intended victim, the defendant concurrently intended to kill everyone in the victim's immediate vicinity to ensure the primary victim's death. When the defendant, in the attempt to kill an intended victim, chooses a means of killing that creates a zone of harm around the victim, the factfinder may reasonably infer that the defendant intended to harm everyone in that zone. (*Id*. at pp. 602-603.)

"In determining the defendant's intent to create a zone of

fatal harm and the scope of any such zone, the jury should consider the circumstances of the offense, such as the type of weapon used, the number of shots fired (where a firearm is used), the distance between the defendant and the alleged victims, and the proximity of the alleged victims to the primary target. Evidence that a defendant who intends to kill a primary target acted with only conscious disregard of the risk of serious injury or death for those around a primary target does not satisfy the kill zone theory." (*Canizales, supra,* 7 Cal.5th at p. 607.) "[T]he kill zone theory does not apply where 'the defendant merely subjected persons near the primary target to lethal risk. Rather, in a kill zone case, the defendant has a primary target and reasons [that] he cannot miss that intended target if he kills everyone in the area in which the target is located. In the absence of such evidence, the kill zone instruction should not be given.' " (*Ibid.*)

In *Canizales*, our Supreme Court cautioned that "there will be relatively few cases" in which the kill zone theory will be applicable and a kill zone instruction appropriate. (*Canizales, supra,* 7 Cal.5th at p. 608.) Such an instruction is only appropriate when there is evidence that: "(1) the circumstances of the defendant's attack on a primary target, including the type and extent of force the defendant used, are such that the only reasonable inference is that the defendant intended to create a zone of fatal harm — that is, an area in which the defendant intended to kill everyone present to ensure the primary target's death — around the primary target; and (2) the alleged attempted murder victim who was not the primary target was located within that zone of harm." (*Id.* at pp. 596-597.)

Cases following *Canizales* have held that kill zone theory applies when the defendants sprayed a house with an assault

11

rifle, from the outside, in the hopes of killing the primary target inside the house (*People v. Cerda* (2020) 45 Cal.App.5th 1, 11-13, pet. for review filed) or when defendants, intending to kill one man, shot at him while another man was standing next to the target and partially shielding the target from the shooters (*People v. Windfield* (2019) 44 Cal.App.5th 196, 204-205, pet. for review filed).

### 2.    The Instruction

In this case, the jury was instructed, without objection, on kill zone with a modified version of CALCIM No. 600, as follows: "Defendant is charged in Counts 3,[6] 4, and 5 with attempted murder.  To prove the defendant guilty of attempted murder the People must prove that the defendant took one direct but ineffective step towards killing another person; [¶] and, two, that the defendant intended to kill that person.  [¶] . . . [¶]  A person may intend to kill a specific victim or victims, and at the same time intend to kill everyone in a particular zone of harm or . . . kill zone.  [¶]  In order to convict the defendant of the attempted murder in counts 3, 4, and/or 5 the People must prove that the defendant not only intended to kill . . . [Allan] Mateo and/or Salvador Diaz, but also either intended to kill the victim in counts 3, 4 or 5 or intended to kill everyone within the kill zone. [¶]  If you have a reasonable doubt whether the defendant

---

[6]     Defendant does not contend the trial court erred by instructing the jury on the "kill zone" theory for count 3 (the attempted murder of Hernandez).  We assume that this concession is not out of any belief that Hernandez, who was shot while running away, was in a kill zone, but rather because the evidence clearly demonstrated a direct intent to kill Hernandez, rendering any instructional error harmless.

12

intended to kill the victim in counts 3, 4, and /or 5, or intended to kill [Allan] Mateo and/or Salvador Diaz by killing everyone in the kill zone, then you must find the defendant not guilty of the attempted murder of the victim in counts 3, 4, and/or 5."

### 3. The Instruction Was Not Supported by the Evidence

Defendant contends giving the instruction was error; we agree. As explained in *Canizales*, the kill zone theory only applies when there is an intended victim, whom the defendant chooses to kill by means of killing everyone in the immediate zone of harm – such as by an explosive device or hail of bullets. That is not this case. Defendant had no prior interaction with the young men on the bleachers; he did not know them or have any reason to attack any one of them more than any of the others. When Mateo answered defendant's gang challenge, defendant shot and killed him. Once Mateo fell, defendant turned his gun toward the other men, who were on one of the higher steps, and therefore to the shooter's left. Even if we assume Mateo was defendant's intended target, it is unreasonable to believe defendant chose to accomplish his attack on that primary target by turning away from Mateo once he fell and then shooting his friends. Defendant had already accomplished what he supposedly set out to do – kill the intended target, the now-mortally wounded Mateo – and defendant would have left the scene.[7]

---

[7] The prosecution suggests that a jury could reasonably infer that defendant intended to ensure the deaths of both Mateo and Diaz by creating a kill zone in the corner of the bleachers and shooting everyone in that zone. The facts do not support this theory. First, there is nothing in the evidence which

13

**4.    The Error Was Harmless Beyond A Reasonable Doubt**

When an erroneous instruction is given, the standard of review turns on whether the instruction was merely factually unsupported or instead legally erroneous.  If the jury was instructed on a factually unsupported theory along with a factually supported one, the error is reviewed under *People v. Watson* (1956) 46 Cal.2d 818, 836, and the error is harmless if it is not reasonably probable that a result more favorable to the defendant would have been reached in the absence of the error. (*Canizales, supra,* 7 Cal.5th at pp. 612-613.)  However, when a jury is instructed on two legal theories, one of which is legally erroneous, we review the error under the harmless beyond a reasonable doubt standard of review of *Chapman v. California* (1967) 386 U.S. 18, 24.  (*People v. Aledamat* (2019) 8 Cal.5th 1, 3.)

It is unnecessary to determine which standard of review applies, because the error was harmless even under the stricter, *Chapman* standard.  Here, with respect to attempted murder, the jury was instructed on both direct intent to kill and kill zone. The error in giving kill zone was harmless beyond a reasonable doubt, because the undisputed evidence is that defendant intended to kill all five young men.

We review the salient facts.  Defendant did not know the

---

distinguishes Diaz from any of the other young men, such that defendant would consider Diaz another primary target and the others simply collateral.  Second, defendant turned and shot Hernandez while he was running away.  If defendant's primary targets were Mateo and Diaz, he would have limited his attack to the corner where Mateo and Diaz remained and again would have presumably left the park.

14

five men before encountering them in an area claimed by a rival gang.  He presented them with a gang challenge.  Mateo responded.  Defendant stated his own gang's name and shot Mateo multiple times.  Mateo went down.  Defendant then turned his gun on the four men who had been sitting with Mateo.  He shot and killed one, Diaz, where he sat.  The others scattered.  As one, Hernandez, ran toward the baseball field, defendant turned and shot him.  It is apparent that defendant's goal was not to kill a primary target by killing everyone around that target, but to shoot and kill all of the young men who dared sit in rival gang territory.  The evidence is overwhelming that there was no primary target and that, instead, defendant intended to kill all of the men on the bleachers, or as many as he could.

## B.    *Substantial Evidence*

Defendant contends the judgment of conviction on count 6 must be reversed because there was insufficient evidence the driver of the Volvo was a member of defendant's gang.  We disagree.

### 1.    **Standard of Review**

" ' "[W]e review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citation.]  We determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." [Citation.]  In so doing, a reviewing court "presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." [Citation.]' " (*People v.*

15

*Williams* (2015) 61 Cal.4th 1244, 1281; *People v. Combs* (2004) 34 Cal.4th 821, 849 ["An appellate court must accept logical inferences that the jury might have drawn from the evidence even if the court would have concluded otherwise"].) The same standard of review applies where the prosecution relies on circumstantial evidence. (*People v. Stanley* (1995) 10 Cal.4th 764, 792.)

### 2. Applicable Law

Section 186.22, subdivision (a), defines the crime of street terrorism and provides in relevant part: "Any person who actively participates in any criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang, shall be punished. . . ." "The plain meaning of section 186.22(a) requires that felonious criminal conduct be committed by at least two gang members, one of whom can include the defendant if he is a gang member. [Citation.]" (*People v. Rodriguez* (2012) 55 Cal.4th 1125, 1132, 1140 (*Rodriguez*); *People v. Vega* (2015) 236 Cal.App.4th 484, 503.) The court in *Rodriguez*, in responding to a hypothetical in which an active participant provides a gang member (a gang leader) with a gun to use in shooting rival gang members, said: "If the active participant is *not* a gang member, he would be no more guilty of violating section 186.22(a) than the gang leader because only one member of the gang—the gang leader—committed the shootings." (*Rodriguez, supra,* 55 Cal.4th at p. 1138.)

### 3. Analysis

The jury was instructed with a CALCRIM No. 1400, which provides: "At least two gang members of that same gang must

16

have participated in committing the felony offense," and "[t]he defendant may count as one of those members if you find that the defendant was a member of the gang." "[T]he jury is presumed to follow the trial court's instructions." (*People v. Fuiava* (2012) 53 Cal.4th 622, 669.)

Substantial evidence permitted the jury to conclude the driver of the Volvo was a member of defendant's gang. Officer Coronado, the prosecutor's gang expert, opined defendant was a member of the Culver City Boys gang and testified the Culver City Boys members were primarily Hispanic and the gang's primary activities included assaults with deadly weapons and auto theft. There was evidence the Volvo had been stolen, and the driver of that stolen car was a Hispanic male. There was also evidence the driver worked closely with defendant, a comrade who was a Culver City Boys gang member, to carry out the shootings. He drove defendant to the location of the crimes; waited for defendant to return to the car; started the car and turned on the headlights after seeing defendant running to the car from the scene of the shootings; and facilitated defendant's escape by fleeing the scene after defendant entered the car. Officer Coronado opined the driver, by helping the shooter, showed he not only knew the shooter and was "associating" with him, but the fact that the car was stolen additionally meant the driver was either a fellow gang member or an associate putting in work with the shooter and representing the gang.

Although the evidence could have been reconciled with a finding that the driver of the Volvo was not a Culver City Boys gang member, a rational trier of fact could have also determined the evidence was sufficient to find the driver was a gang member. Nothing more is required to affirm the judgment on

17

count 6.  (*Center for Biological Diversity v. Department of Fish & Wildlife* (2015) 62 Cal.4th 204, 215; *City of Glendale v. Marcus Cable Associates, LLC* (2014) 231 Cal.App.4th 1359, 1385.)

### C.    *Admission of Psychological Impact Evidence*

Defendant contends the trial court violated his federal rights of due process and fair trial by erroneously admitting irrelevant evidence concerning the psychological impact of the attempted murder on Santiago.  We disagree.

#### 1.    **Standard of Review**

We review a trial court's ruling on the admissibility of evidence for an abuse of discretion.  (*People v. Alvarez* (1996) 14 Cal.4th 155, 203.)  "A trial court abuses its discretion when its ruling 'fall[s] "outside the bounds of reason." ' [Citations.]" (*People v. Waidla* (2000) 22 Cal.4th 690, 714.)  If the erroneous admission "implicates defendant's federal constitutional rights to due process and concerns the fundamental fairness of his trial, we will apply the de novo standard of review."  (*People v. Albarran (*2007) 149 Cal.App.4th 214, 225, fn. 7.)

#### 2.    **Applicable Law**

The admission of evidence regarding the psychological impact of a gunshot victim is irrelevant at trial in a non-capital case.  (*People v. Redd* (2010) 48 Cal.4th 691, 731- 732.)  The admission of evidence violates a defendant's federal due process rights if it makes the trial fundamentally unfair.  (*People v. Partida* (2005) 37 Cal.4th 428, 439.)

#### 3.    **Relevant Proceedings**

During Santiago's testimony, the following exchange occurred:  [The Prosecutor]:  Now, Mr. Santiago, after this shooting happened in 2011, what trajectory did your life take?  [¶]  [Defense Counsel]: Objection.  Relevance.  [¶]  The Court:

18

Overruled.  Do you understand the question?  [¶]  [Santiago]: Yeah.  [¶]  The Court:  Did this shooting in any way change the way you were living.  [¶]  [Santiago]:  Yeah.  It did.  [¶]  [The Prosecutor]:  How was that?  [¶]  [Santiago]:  I was trying to forget.  I started using drugs trying to forget.  Everything that happened."

### 4. Analysis

Defendant contends the admission of the challenged evidence, inter alia, violated his federal rights to due process and a fair trial.  Defendant forfeited the federal portion of his claim of error by failing to object at trial on any ground other than relevance.  (*People Martinez* (2010) 47 Cal.4th 911, 961 [defendant forfeited his federal claims, including his claims for violation of his due process and fair trial rights, "because defense counsel objected to [the] evidence only on Evidence Code section 352 grounds"].).

Even if the trial court erred in admitting evidence of the psychological impact of the shooting on Santiago, any error was harmless under the standard of either *People v. Watson* (1956) 46 Cal.2d 818, 836-837 [more favorable outcome for defendant reasonably probable absent error], or *Chapman v. California* (1967) 386 U.S. 18, 24 [harmless beyond a reasonable doubt]. As discussed above, the evidence of defendant's attempted murder of Santiago was overwhelming.

### D. *Cumulative Impact*

Defendant contends even if the trial court errors in instructing the jury on the "kill zone" theory for counts 4 and 5, and in admitting evidence of the psychological impact on Santiago, did not warrant reversal of the convictions on counts 4 and 5, the cumulative impact of those errors does.  Both errors

19

are harmless, due to the overwhelming evidence that defendant intended to kill all five men.  The combination of the errors does not change our conclusion.

## E.     *Parole Revocation Restitution Fine*

Defendant contends, and the Attorney General agrees, the trial court erred in imposing a parole revocation fine. We accept the Attorney General's concession.

The trial court imposed but stayed all of the determinate sentences (counts 6 and 7) and imposed a $200 parole revocation restitution fine pursuant to section 1202.45.[8]  A parole revocation restitution fine may not be imposed when all determinate sentences have been stayed under section 654.  (*People v. Pearson* (1986) 42 Cal.3d 351, 361, rejected on other grounds by *People v. Vidana* (2016) 1 Cal.5th 632, 650-651; *People v. Cruz* (2012) 207 Cal.App.4th 664, 672-673, fn. 8.)

We reverse the trial court's imposition of the $200 parole revocation restitution fine. The indeterminate abstract of judgment should be amended to delete any reference to a $200 parole revocation fine.

## F.     *Custody Credit*

Defendant contends, and the Attorney General concedes, the trial court erred in failing to credit defendant for the actual days he served prior to sentencing.  We agree.

A person convicted of murder is entitled to credit for actual time spent in custody prior to sentencing.  (§ 2900.5, subd. (a); *People v. Herrera* (2001) 88 Cal.App.4th 1353, 1366.)  Defendant was arrested on June 28, 2011 and sentenced on February 11,

---

[8]     Although the trial court stayed all of the determinate sentences, the parole revocation fine is reflected on the indeterminate abstract of judgment.

20

2015; a total of 1,325 days.  The trial court declined to credit defendant for the actual days he served prior to sentencing.  As noted, however, defendant was entitled to actual presentence custody credits.

We reverse the trial court's refusal to award defendant custody credit.  Both the indeterminate abstract of judgment and the determinate abstract of judgment should be amended to reflect defendant is entitled to 1,325 actual days of credit.

## G.      *Correction of the Indeterminate Abstract of Judgment to Reflect Oral Pronouncements*

The Attorney General argues, and defendant agrees, the indeterminate abstract of judgment should be corrected to reflect the trial court's oral pronouncements that defendant was sentenced to serve his terms on counts 1 - 5 consecutively, and was to serve the term of life with a possibility of parole on counts 3 - 5.  The abstract of judgment must be so amended.

The indeterminate abstract of judgment fails to reflect the trial court sentenced defendant to serve his indeterminate terms for counts 1 - 5 consecutively.  It also reflects the trial court sentenced defendant to three terms of 15 years to life on counts 3 - 5, but on counts 3 - 5 the trial court sentenced defendant to terms of life with the possibility of parole.  (§§ 186.22, subd. (b)(5), 664, subd. (a).)

An abstract of judgment must fully and accurately reflect a defendant's sentence.  (*People v. Mitchell* (2001) 26 Cal.4th 181, 185-186 (*Mitchell*).)  "[A] trial court's oral sentence governs if it is different from what appears in a minute order or an abstract of judgment [citations] . . . ."  (*People v. Wynn* (2010) 184 Cal.App.4th 1210, 1221; *Mitchell, supra,* 26 Cal.4th at p. 185; *People v. Walz* (2008) 160 Cal.App.4th 1364, 1367, fn. 3.)

21

Accordingly, the indeterminate abstract of judgment should be amended to reflect the trial court sentenced defendant to serve his indeterminate terms on counts 1 - 5 consecutively, and to serve the term of life with a possibility of parole on counts 3 - 5.

## DISPOSITION

We reverse the trial court's imposition on defendant of a $200 parole revocation restitution fine, and its refusal to award defendant custody credit.  The matter is remanded for the trial court to amend the indeterminate abstract of judgment to delete any reference to a $200 parole revocation fine; reflect defendant is to serve his indeterminate terms on counts 1 - 5 consecutively; and to indicate the term on counts 3 - 5 life with a possibility of parole.  The trial court shall also amend both the indeterminate abstract of judgment and the determinate abstract of judgment to reflect defendant is entitled to 1,325 actual days of custody credit. The trial court is to deliver the amended abstracts of judgment to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.

RUBIN, P. J.

WE CONCUR:

BAKER, J.

MOOR, J.

22